**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**BIO GEN, LLC, DRIPPERS VAPE SHOP, LLC,
THE CIGARETTE STORE LLC d/b/a SMOKER
FRIENDLY, and SKY MARKETING
CORPORATION d/b/a HOMETOWN HERO**          **PLAINTIFFS**

**v.**          **Case No. 4:23-CV-718 (BRW)**

**THE STATE OF ARKANSAS;
GOVERNOR SARAH HUCKABEE SANDERS
in her official capacity; ATTORNEY GENERAL
JOHN TIMOTHY GRIFFIN in his official capacity;
TODD MURRAY, SONIA FONTICIELLA,
DEVON HOLDER, MATT DURRETT,
JEFF PHILLIPS, WILL JONES, TERESA HOWELL,
BEN HALE, CONNIE MITCHELL, DAN TURNER,
JANA BRADFORD, FRANK SPAIN, TIM BLAIR,
KYLE HUNTER, DANIEL SHUE, JEFF ROGERS,
DAVID ETHREDGE, TOM TATUM, II,
DREW SMITH, REBECCA REED MCCOY,
MICHELLE C. LAWRENCE, DEBRA BUSCHMAN,
TONY ROGERS, NATHAN SMITH, CAROL CREWS,
KEVIN HOLMES, CHRIS WALTON,
and CHUCK GRAHAM, each in his or her official capacity
as a prosecuting attorney for the State of Arkansas;
ARKANSAS DEPARTMENT OF FINANCE
AND ADMINISTRATION; ARKANSAS
TOBACCO CONTROL BOARD; ARKANSAS
DEPARTMENT OF AGRICULTURE; and
ARKANSAS STATE PLANT BOARD**          **DEFENDANTS**

<u>**MOTION TO DISMISS AND RESPONSE IN OPPOSITION
TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR
ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION**</u>

Come Defendants, by and through Attorney General Tim Griffin and Senior Assistant Attorney General Jordan Broyles, and for their Motion to Dismiss and Response in Opposition to Plaintiffs' Motion for Temporary Restraining Order or Alternative Motion for Preliminary Injunction, state:

1

**INTRODUCTION**

Plaintiffs allege Act 629 is unconstitutional for various reasons, none of which are founded in the law. It does not "destroy the ability to cultivate hemp of any kind," it does not "create[e] insurmountable confusion," and the regulatory scheme is not a "sham." Arkansas recognizes that industrial hemp is a valuable commodity when cultivated as intended. Act 629 does not stifle such production, and instead, protects Arkansas from the adulterated products that result from chemical synthesis.

At the outset, Plaintiffs' claims fail for procedural reasons. As against the State of Arkansas, the Governor of Arkansas, the Arkansas Attorney General, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board, their claims fail as a matter of law because these defendants are immune from suit. For the same reasons, Plaintiffs lack standing to pursue their claim as against them. Accordingly, the Defendants are entitled to judgment as a matter of law.

Plaintiffs' claims also fail on the merits. They allege Act 629 violates the Supremacy and Commerce Clauses of the U.S. Constitution, and that the regulatory framework within the law rise to the level of an impermissible regulatory taking under the Fifth Amendment. Plaintiffs also contend the Act is vague in violation of the Due Process Clause of the Fifth and Fourteenth Amendments. Based on these allegations, Plaintiffs request this Court enjoin enforcement of the entire act.

These allegations are foreclosed by a clean reading of the 2018 Farm Bill (7 U.S.C. §§ 1639o-1639s) and Act 629.

The law does not violate the Supremacy Clause. The 2018 Farm Bill unequivocally states that it does not "preempt[] or limit[] any law of a State or Indian tribe that—(i) regulates the

production of hemp; and (ii) is more stringent than this subchapter." 7 U.S.C. § 1639p(a)(3). In fact, states are permitted to ban the production of hemp all together. 7 U.S.C. § 1639p(f); *see also* the USDA Memorandum, "Legal Opinion on Certain Provisions of the Agriculture Improvement Act of 2018 Relating to Hemp," p. 3, attached to Plaintiffs' Complaint as Exhibit 2.

The law does not violate the Commerce Clause. Section 7 became effective on August 1, 2023, and is consistent with the requirements of the 2018 Farm Bill regarding the transportation and shipment of hemp, which is the only provision of the law that preempts state law. Thus, there is no basis for finding Sections 2-7 (currently the only provisions in effect) are unconstitutional, and Plaintiffs are precluded from arguing there was an impermissible regulatory taking.

Finally, the concerns raised by Plaintiffs in their vagueness argument were corrected by the Arkansas Code Revision Commission on June 13, 2023. No due process violation exists.

Because the statute is constitutional, there is little likelihood that Plaintiffs will succeed on the merits of their claims. They have also failed to show a threat of irreparable harm, and instead, enjoining the implementation of this law would be of much greater harm to Arkansans, who have a strong interest in enforcing legislation legally passed that complies with all aspects of the law.

For the reasons more fully set forth below, Plaintiffs' case as against the State of Arkansas, the Governor of Arkansas, the Arkansas Attorney General, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board should be dismissed on immunity and standing.

As against the remaining 28 prosecuting attorneys, Plaintiffs' Motion for Temporary Restraining Order or Alternative Motion for Preliminary Injunction should be denied for failure to satisfy their burden of proving entitlement to such extraordinary relief.

BACKGROUND

### I.    <u>Current Federal Law</u>

Prior to the 2014 Farm Bill, the cultivation of hemp was largely restricted under federal law. Signed into law on February 7, 2014, the bill (Agricultural Act of 2014, P.L. 113-79 §7606) established the Hemp Research Pilot Program (7 U.S.C. § 5940).[1] This program permitted hemp cultivation for research purposes only by either higher education institutions or state departments of agriculture.[2] "Production [was] subject to state/territory laws and regulations and was not legalized under federal law or in interstate commerce" and "[t]he program did not include cultivation by Indian tribes."[3] The 2014 Farm Bill defined "industrial hemp" (7 U.S.C. § 5940) as "the plant *Cannabis sativa L.* and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."[4] Hemp remained a Schedule I drug under the Controlled Substances Act regulated by the DEA.[5]

The 2018 Farm Bill (Agriculture Improvement Act of 2018, P.L. 115-334, §§ 10113-10114, 12619) added a new, slightly different definition of "hemp" (7 U.S.C. § 1639o): "the plant *Cannabis sativa L.* and any part of that plant, *including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers*, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."[6] Both definitions require a THC concentration of not more than 0.3 percent for a *Cannabis sativa L.* plant to be considered hemp versus marijuana.

---

[1] Congressional Research Service, *Comparing Hemp Provisions in the 2014 and 2018 Farm Bills* (Dec. 2, 2021), p. 1, https://crsreports.congress.gov/product/pdf/IF/IF11984.
[2] *Id*.
[3] *Id*.
[4] *Id*. at 2.
[5] *Id*.
[6] *Id*. (emphasis added).

4

The bill also:

- Established the Domestic Hemp Production Program, made hemp production eligible to some USDA programs, and scheduled the repeal of the Hemp Pilot Program;

- Allowed hemp production under the oversight of either a state, territory, or tribal authority (subject to USDA's approval) or by the USDA under a general license (effective March 2021);

- Removed "hemp" from the definition of "marijuana" in the CSA so it was no longer a Schedule I drug; and

- Eased interstate commerce restrictions—requiring states to allow the interstate transport and shipment of hemp or hemp products produced in accordance with 7 U.S.C. §§ 1639o-1639s.[7]

The USDA was charged with the responsibility of issuing guidelines and regulations regarding the production of hemp, but "Congress explicitly retained a role for DEA and the U.S. Attorney General (AG) to carry out certain activities, including requiring USDA to consult with the AG in auditing state compliance, providing technical assistance, reporting and enforcing violations, and sharing information with federal law enforcement."[8] "Congress [also] explicitly preserved the authority of the FDA under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301, et seq.) over certain hemp-derived products."[9]

As noted above, the 2018 Farm Bill does not preempt any state law regulating the production of hemp and that is more stringent than the federal law. 7 U.S.C. § 1639p(a)(3).

## II.   **Hemp and the Concern for Synthetic Cannabinoids**

"Cannabis" is the general term for the *Cannabis sativa L.* plant.[10] Marijuana and industrial hemp are different varieties of this plant species. Marijuana refers to the plant, including flower,

---

[7] *Id*.
[8] *Id*.
[9] *Id*.
[10] *See* 2023 AR Hemp Program Orientation PowerPoint, 2023 Growing Season, p. 7, a copy of which is attached hereto as Exhibit A.

seeds and extracts with more than 0.3% total delta-9 tetrahydrocannabinol (THC) on a dry weight

basis.[11] "Hemp" is any part of the plant containing 0.3% or less Total THC on a dry weight basis.[12]

The two commonly known cannabinoids in cannabis plants are THC and cannabidiol (CBD). THC

produces psychoactive (i.e., impairing or mind-altering) effects or "high" associated with mariju-

ana.[13] CBD, on the other hand, is not psychoactive and does not cause a "high."[14]

      "THC" generally "refers to the delta-9 THC isomer, the most prominently occurring THC

isomer in cannabis. However, THC has several other isomers that occur in the cannabis plant,

including delta-8 THC."[15] Though delta-8 THC occurs naturally in the cannabis plant, it exists

only in trace quantities, and "is estimated to be about 50-75% as psychoactive as delta-9 THC."[16]

In other words, the natural concentrations of THC are too low in hemp to be psychoactive.

      But, as explained in a CDC Health Alert Network (HAN) Health Advisory, CBD in hemp

is being "synthetically converted into delta-8 THC, as well as delta-9 THC and other THC isomers,

with a solvent, acid, and heat to produce higher concentrations of delta-8 THC than those found

naturally in the cannabis plant."[17]

      Unlike marijuana, hemp has a high-CBD concentration.[18] An opinion of the Indiana Attor-

ney General Todd Rokita explains the process and risks of synthetic cannabinoids as follows:

> THC can be chemically extracted from the cannabis plant, or it can
> be completely chemically manufactured in a laboratory. Synthetic
> cannabinoids are not naturally produced by the human body or by

---

[11] *Id*.

[12] *Id*.; *see also* 7 U.S.C. 1639o(1).

[13] Increases in Availability of Cannabis Products Containing Delta-8 THC and Reported Cases of Adverse Events, Health Alert Network, Centers for Disease Control and Prevention (Sept. 14, 2021), https://emergency.cdc.gov/han/2021/han00451.asp#:~:text=The%20purpose%20of%20this%20Health,THC)%20and%20the%20potential%20for.

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17] *Id*.

[18] Official Opinion 2023-1, *Tetrahydrocannabinol Variants and Other Designer Cannabinoid Products*, Indiana Attorney General Todd Rokita, Jan. 12, 2023, p. 3, https://www.in.gov/attorneygeneral/files/Official-Opinion-2023-1.pdf.

the cannabis plant, but instead are created artificially (usually in a laboratory). They mimic THC and produce similar effects in humans as naturally-produced cannabinoids because they bind to the same receptors in the brain. They fully saturate the brain's cannabinoid receptors, making them anywhere from 100 to 800 times more powerful than the THC found naturally in the cannabis plant, which can lead to overdoses as well as other side effects.

There are hundreds of synthetic cannabinoids on the market. They are sprayed onto shredded plant material and smoked, mixed into a liquid or oil for vaping in e-cigarettes, or consumed by adding to tea or food. Although the health risks are relatively unknown, and they are much more potent than naturally-occurring THC, synthetic cannabinoids are popular because consumers believe they are both legal and safe. However, there is a wide range of variation among synthetic cannabinoids, and they are very different chemicals from that of naturally-occurring THC.[19]

The 2020 DEA Resource Guide provides that "[s]ynthetic cannabinoids are not organic, but are chemical compounds created in a laboratory."[20] Illustrating the synthetic compound process for delta-8-THC, Christopher Hudalla, president and chief scientific officer of ProVerde Laboratories, said, "Like making methamphetamine from cold medicine, just because the starting materials are legal does not make the resulting product legal (or safe).[21]

In 2021, Mr. Wade Hodge, Chief Counsel for the Arkansas Department of Agriculture, reached out to the DEA regarding the control status of delta-8-THC that is manufactured from CBD extracted from the plant *Cannabis sativa L. See* Correspondence between Mr. Hodge and the DEA, attached hereto collectively as Exhibit B. As stated therein, Terrence L. Boos, Ph.D., Chief Drug & Chemical Evaluation Section of the DEA, wrote, "Arriving at delta-8-THC by a chemical reaction starting from CBD makes the delta-8-THC synthetic and therefore, not exempted by the

---

[19] *Id.* at 4 (internal citations omitted).
[20] https://www.dea.gov/sites/default/files/2020-04/Drugs%20of%20Abuse%202020-Web%20Version-508%20compliant-4-24-20_0.pdf (last accessed Aug. 8, 2023).
[21] https://cen.acs.org/biological-chemistry/natural-products/Delta-8-THC-craze-concerns/99/i31 (last accessed August 8, 2023).

[Agriculture Improvement Act]. Any quantity of delta-8-THC obtained by chemical means is a controlled substance." *Id.*

On February 13, 2023, Dr. Boos reaffirmed that synthetic THC compounds are Schedule I controlled substances.[22] In response to an inquiry as to the control status of THC acetate ester (THCO), Dr. Boos identified delta-9-THCO (delta-9-THC acetate ester) and delta-8-THCO (delta-9-THC acetate ester) as the only substances of which the DEA was aware of the THC acetate ester.[23] Explaining further, Dr. Boos opined:

> The CSA classifies tetrahydrocannabinols (THC) as controlled in schedule I. 21 U.S.C. § 812, Schedule I(c)(17); 21 CFR 1308.11(d)(31). Subject to limited exceptions, for the purposes of the CSA, the term "tetrahydrocannabinols" means those "naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant." 21 CFR § 1308.11(d)(31).
>
> Delta-9-THCO and delta-8-THCO do not occur naturally in the cannabis plant and can only be obtained synthetically, and therefore do not fall under the definition of hemp. Delta-9-THCO and delta-8-THCO are tetrahydrocannabinols having similar chemical structures and pharmacological activities to those contained in the cannabis plant. Thus, delta-9-THCO and delta-8-THCO meet the definition of "tetrahydrocannabinols," and they (and products containing delta-9-THCO and delta-8-THCO) are controlled in schedule I by 21 U.S.C. § 812(c) Schedule I, and 21 CFR § 1308.11(d). The Controlled Substances Code Number (CSCN) assigned to these substances are 7370, which is that of tetrahydrocannabinols, and the conversion factors (CF) are 1.00. Because delta-9-THCO and delta-8-THCO are controlled substances, they do not meet the definition of controlled substance analogues under 21 U.S.C. § 813.[24]

---

[22] https://cannabusiness.law/wp-content/uploads/DEA-THCO-response-to-Kight.pdf (last accessed Aug. 8, 2023).
[23] *Id.*
[24] *Id.*

### III.    Arkansas law and Act 629

In response to the 2014 Farm Bill, the Arkansas legislature passed the Arkansas Industrial Hemp Act of 2017.[25] In June 2018, the Arkansas State Plant Board approved rules to implement the "Arkansas Industrial Hemp Research Pilot Program," which were officially adopted in August 2018.[26] For the first time in eight decades, in 2019 hemp was legally planted and harvested in Arkansas.[27] On January 1, 2022, the Arkansas Hemp Research Licensing Program became known as the Arkansas Hemp Program.[28] Arkansas had its first season of commercial hemp production in 2022 that was permitted under the 2018 Farm Bill and Arkansas Hemp Production Act of 2021.[29]

During the 2023 legislative session, the 94th General Assembly passed Senate Bill 358 amending the law "concerning certain Delta THC substances; to prohibit the growth, processing, sale, transfer, or possession of industrial hemp that contains certain Delta THC substances; to include Delta-8, Delta-9, and Delta-10 THC in the list of Schedule VI controlled substances; to declare an emergency; and for other purposes."[30] On April 11, 2023, the bill was signed into law by Governor Sanders as Act 629.

The Arkansas Code Revision Committee is responsible for arranging the publication of the Arkansas statutes including compilations, recompilations, revisions, codifications or recodifications of, or cumulative or noncumulative supplements to the statutes. *See* Ark. Code Ann. § 1-2-303(a)(1). In executing these duties, "the commission shall not authorize any change in the

---

[25] Arkansas Acts 2017, No. 981, https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2017R%2FPublic%2FACT981.pdf.
[26] *See* 2023 AR Hemp Program, Note 8, *supra*.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] Arkansas Acts 2023, No. 629, https://www.arkleg.state.ar.us/Home/FTPDocument?path=%2FACTS%2F2023R%2FPublic%2FACT629.pdf

substance or meaning of any provision of the Arkansas Code or any act of the General Assembly. *See* Ark. Code Ann. § 1-2-303(d)(1). The Bureau of Legislative Research is held to the same obligation in its duties to assist the commission. *Id.* Under the direction of the commission, the bureau may take such actions as requested including to "[c]orrect manifest errors in references to laws and other documents"; "[s]ubstitute the proper Arkansas Code section number, subchapter number, chapter number, subtitle number, title number, or other number or designation for the terms 'this act', 'the preceding Code section', or any similar words or phrases"; "[n]umber, renumber, redesignate, and rearrange chapters, subchapters, sections, subsections, and subdivisions, or any combination or portion of chapters, subchapters, sections, subsections, and subdivisions"; and "[c]hange internal reference numbers to agree with renumbered chapters, subchapters, sections, subsections, subdivisions, or portions of chapters, subchapters, sections, subsections, and subdivisions." *See* Ark. Code Ann. § 1-2-303(d)(1)(D-H).

The commission met on June 13, 2023, and was presented with the staff report of the Bureau of Legislative Research, a copy of which is attached hereto as Exhibit C. Item A2 in the report concerned Acts 2023, No. 629. *Id*. The bureau's report referenced sections 16 and 17 as containing "manifest reference errors to Sections 6-13, Sections 6-14, and Sections 2-5 of the act." *Id*. As taken from the report:

> **ISSUE:** Act No. 629, § 16, is a section requiring rulemaking under Sections 6 – 13 of the act. Act No. 629, § 17, is a contingent effective date section for Sections 6 – 14 of the act, based on Sections 2 – 5 of the act being enjoined from enforcement. However, these references to sections of the act appear to be manifest reference errors due to the first amendment to the bill in the House (HA #1). HA #1 added two new sections to the bill (Sections 4 and 5 of the act), but did not update the section references in § 16 or § 17 of the act. A similar issue existed in § 18 of the act, but a subsequent amendment revised the numbering for this section.

10

> **STAFF THOUGHTS:** An option is a commission determination that the references to Sections 6 – 13 in Section 16 should instead be to Sections 8 – 15, determine that the references to Sections 6 – 14 and Sections 2 – 5 in Section 17 should instead be to Sections 8 – 16 and Sections 2 – 7, codify the affected code sections in accordance with these determinations, and instruct staff to add ACRC notes at the affected sections reflecting the commission's determination that the referenced section numbers were manifest reference errors.

*Id*. As reflected in the June 13, 2023 minutes, Mr. Kevin Koon, the Administrator of the Statutory Review Section of the Bureau of Legislative Research, "introduced items A1-A8, concerning manifest reference errors." *See* Minutes of Arkansas Code Revision Commission Meeting on June 13, 2023 at p. 3, a copy of which is attached hereto as Exhibit D. There was a motion "to approve the recommended corrections to manifest reference errors identified in items A1-A8" and a second. *Id*. The motion was adopted. *Id*. A copy of the Arkansas Code sections as amended or created by Act 629 reflecting the corrections is attached hereto as Exhibit E. Each pertinent Arkansas Code section or subchapter has an Arkansas Code Revision Commission (A.C.R.C.) note concerning Acts 2023, No. 629. For example, the A.C.R.C. Notes on pg. 3 state:

> Acts 2023, No. 629, § 17, provided: "Contingent effective date. Sections 6-14 of this act shall become effective only upon the certification of the Arkansas Attorney General that the State of Arkansas is currently enjoined from enforcing Sections 2-5 of this act relating to delta-8 tetrahydrocannabinol and delta-10 tetrahyrdocannabinol, but no earlier than August 1, 2023."

> The Arkansas Code Revision Commission determined that the references to "Sections 6-13", "Sections 6-14", and "Sections 2-5" in Acts 2023, No. 629, §§ 16 and 17, were manifest reference errors and that the references should be to "Sections 8-15", "Sections 8-16", and "Sections 2-7", respectively.

*Id*. Importantly, this corrected Sections 16 and 17 to read as follows:

> SECTION 16. DO NOT CODIFY. Rules.

(a) When adopting the initial rules required under Sections 8 - 15 of this act, the Arkansas Tobacco Control shall file the final rules with the Secretary of State for adoption under § 25-15-204(f):

(1) On or before January 1, 2024; or

(2) If approval under § 10-3-309 has not occurred by January 1, 2024, as soon as practicable after approval under § 10-3-309.

(b) Arkansas Tobacco Control shall file the proposed rules with the Legislative Council under § 10-3-309(c) sufficiently in advance of January 1, 2024, so that the Legislative Council may consider the rules for approval before January 1, 2024.

SECTION 17. Contingent effective date.

Sections 8 - 16 of this act shall become effective only upon the certification of the Arkansas Attorney General that the State of Arkansas is currently enjoined from enforcing Sections 2 - 7 of this act relating to delta-8 tetrahydrocannabinol and delta-10 tetrahyrdocannabinol, but no earlier than August 1, 2023.

Thus, the only provisions that are in effect as of August 1, 2023 are Sections 2 – 7 of Act 629.

A side-by-side comparison of federal and Arkansas law demonstrates they are coherent.

| Act 629 | Arkansas Law | Federal Law |
|---|---|---|
| Section 2<br><br>Definition of Hemp<br><br>Arkansas Industrial Hemp Production Act | A.C.A. § 2-15-503(5)<br><br>"Industrial hemp" means the plant Cannabis sativa and any part of the plant, including the seeds of the plant and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a total delta-9 tetrahydrocannabinol concentration of no more than three-tenths of one percent (0.3%) of the hemp-derived cannabidiol on a dry weight basis, unless specifically controlled under the Uniform Controlled Substances Act, § 5-64-101 et seq. | 7 U.S.C. 1639o(1)<br><br>The term "hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. |
| Section 3<br><br>Violations of Arkansas Industrial Hemp Production Act | A.C.A. § 2-15-15(a)<br><br>(a) A grower has committed a negligent violation of this subchapter if the grower negligently: | 7 U.S.C. 1639p(e)<br><br>(e)(2) Negligent violation<br>(A) In general<br>    A hemp producer in a State or the territory of an Indian tribe for which a State or Tribal plan is approved |

12

| | | |
|---|---|---|
| | (1) Fails to provide a legal description of land on which the grower produces industrial hemp;<br>(2) Fails to obtain a license from the State Plant Board; or<br>(3) Produces Cannabis sativa with a tetrahydrocannabinol concentration exceeding the tetrahydrocannabinol level threshold of a negligent violation as defined by federal rule and in this subchapter. | under subsection (b) shall be subject to subparagraph (B) of this paragraph if the State department of agriculture or Tribal government, as applicable, determines that the hemp producer has negligently violated the State or Tribal plan, including by negligently—<br>    (i) failing to provide a legal description of land on which the producer produces hemp;<br>    (ii) failing to obtain a license or other required authorization from the State department of agriculture or Tribal government, as applicable; or<br>    (iii) producing Cannabis sativa L. with a delta-9 tetrahydrocannabinol concentration of more than 0.3 percent on a dry weight basis. |
| <u>Section 4</u><br><br>Exclusion from the definition of "marijuana" under Uniform Controlled Substances Act | A.C.A. § 5-64-101(16)<br><br>(16)<br>(A) "Marijuana" means:<br>    (i) Any part and any variety or species, or both, of the Cannabis plant that contains THC (Tetrahydrocannabinol) whether growing or not;<br>    (ii) The seeds of the plant;<br>    (iii) The resin extracted from any part of the plant; and<br>    (iv) Every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or resin.<br>(B) "Marijuana" does not include:<br>    (i) The mature stalks of the plant;<br>    (ii) Fiber produced from the stalks;<br>    (iii) Oil or cake made from the seeds of the plant;<br>    (iv) Any other compound, manufacture, salt, derivative, mixture, or preparation of the: | Section 12619(a) amended the definition of "marijuana" in the CSA to exclude hemp.<br><br>21 U.S.C. § 802(16)<br>(16)(A) Subject to subparagraph (B), the terms "marihuana" and "marijuana" mean all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.<br>    (B) The terms "marihuana" and "marijuana" do not include—<br>    (i) hemp, as defined in section 1639o of title 7; or<br>    (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the |

| | | |
|---|---|---|
| | (a) Mature stalks, except the resin extracted from the mature stalks;<br>    (b) Fiber;<br>    (c) Oil; or<br>    (d) Cake;<br>    (v) The sterilized seed of the plant that is incapable of germination; or<br>    (vi) Hemp-derived cannabidiol that:<br>    (a) Contains not more than three-tenths of one percent (0.3%) of delta-9 tetrahydrocannabinol (THC) on a dry weight basis as verified by a nationally accredited laboratory for quality, purity, and accuracy standards; and<br>    (b) Is not approved by the United States Food and Drug Administration for marketing as a medication; | sterilized seed of such plant which is incapable of germination. |
| Section 5<br><br>Uniform Controlled Substances Act – Substances in Schedule VI | A.C.A. § 5-64-215(a)(2)(B)<br><br>(a) In addition to any substance placed in Schedule VI by the Secretary of the Department of Health under § 5-64-214, any material, compound, mixture, or preparation, whether produced directly or indirectly from a substance of vegetable origin or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, that contains any quantity of the following substances, or that contains any of their salts, isomers, and salts of isomers when the existence of the salts, isomers, and salts of isomers is possible within the specific chemical designation, is included in Schedule VI:<br>(1) Marijuana; | Second, Section 12619(b) amended Schedule I of the CSA to exclude the THC found in hemp from the definition of "tetrahydrocannabinols."<br><br>21 U.S.C. § 812(c)(17).<br><br>(c) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:<br>. . .<br>(17) Tetrahydrocannabinols, except for tetrahydrocannabinols in hemp (as defined under section 1639o of title 7). |

| | | |
|---|---|---|
| | (2) Tetrahydrocannabinols, unless the tetrahydrocannabinol is:<br>  (A) Contained in hemp-derived cannabidiol;<br>  (B) Not more than three-tenths of one percent (0.3%) of delta-9 tetra-hydrocannabinol in the hemp-de-rived cannabidiol on a dry weight basis as verified by a nationally ac-credited laboratory for quality, purity, and accuracy stand-ards; and<br>  (C) Not approved by the United States Food and Drug Administra-tion for marketing as a medication;<br>(3) A synthetic equivalent of:<br>  (A) The substance contained in the Cannabis plant; or<br>  (B) The substance contained in the resinous extractives of the ge-nus Cannabis; | |
| <u>Section 6</u><br><br>Uniform Controlled Substances Act – Substances in Schedule VI | A.C.A. § 5-64-215(a)<br>(5) Synthetic substances, deriva-tives, or their isomers in the chemi-cal structural classes described be-low in subdivisions (a)(5)(A)-(J) of this section and also specific un-classified substances in subdivision (a)(5)(K) of this sec-tion. Compounds of the structures described in this subdivision (a)(5), regardless of numerical designation of atomic positions, are included in this subdivision (a)(5). The syn-thetic substances, derivatives, or their isomers included in this subdi-vision (a)(5) are:<br>(A) (i) Tetrahydrocannabinols, in-cluding without limitation the fol-lowing:<br>  (a) Delta-1 cis or trans tetrahy-drocannabinol, otherwise known as a delta-9 cis or trans tetrahydrocan-nabinol, and its optical isomers; | The federal government does not have a Schedule VI under the Con-trolled Substances Act. 21 U.S.C. § 812. |

15

|  | (b) Delta-6 cis or trans tetrahy-drocannabinol, otherwise known as a delta-8 cis or trans tetrahydrocannabinol, and its optical isomers; <br><br>(c) Delta-3,4 cis or trans tetrahydrocannabinol, otherwise known as a delta-6a,10a cis or trans tetrahydrocannabinol, and its optical isomers; <br><br>(d) Delta-10 cis or trans tetrahydrocannabinol, and its optical isomers; <br><br>(e) Delta-8 tetrahydrocannabinol acetate ester; <br><br>(f) Delta-9 tetrahydrocannabinol acetate ester; <br><br>(g) Delta-6a,10a tetrahydrocannabinol acetate ester; <br><br>(h) Delta-10 tetrahydrocannabinol acetate ester; <br><br>(i) A product derived from industrial hemp that was produced as a result of a synthetic chemical process that converted the industrial hemp or a substance contained in the industrial hemp into delta-8, delta-9, delta-6a,10a, or delta-10 tetrahydrocannabinol including their respective acetate esters; and <br><br>(j) Any other psychoactive substance derived therein. |  |
| Section 7 <br><br>Uniform Controlled Substances Act – Substances in Schedule VI regarding Transportation and Shipment | A.C.A. § 5-64-215(d) <br><br>(d) This section does not prohibit the continuous transportation through Arkansas of the plant Cannabis sativa L., and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis, | 7 U.S.C. 1639o <br>Statutory Notes and Related Subsidiaires – Interstate Commerce <br>Pub. L. 115–334, title X, §10114, Dec. 20, 2018, 132 Stat. 4914 <br><br>''(a) RULE OF CONSTRUCTION.—Nothing in this title or an amendment <br>made by this title prohibits the interstate commerce of <br>hemp (as defined in section 297A of the Agricultural Marketing Act of |

| | produced in accordance with 7 U.S.C. § 1639o et seq. | 1946 [7 U.S.C. 1639o] (as added by section 10113)) or hemp products. ''(b) TRANSPORTATION OF HEMP AND HEMP PROD-UCTS.— No State or Indian Tribe shall pro-hibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 [7 U.S.C. 1639o et seq.] (as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.'' |
|---|---|---|

**ARGUMENT**

**I.   THE ELEVENTH AMENDMENT BARS THE SUIT AND THERE IS NO ARTICLE III CASE OR CONTROVERSY BECAUSE PLAINTIFFS LACK STANDING TO SUE**

Federal court jurisdiction is limited to "cases" and "controversies." Art. III U.S. Const.; *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015) (citing *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013). "Standing is an essential and unchanging part of the case-or-controversy requirement." *Dig. Recognition Network*, 803 F.3d at 956 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). To establish standing, a plaintiff must establish three elements: an injury in fact, traceability of that injury to the conduct of which the plaintiff complains, and redressability of the injury by a favorable decision. *Dig. Recognition Network*, 803 F.3d at 956 (quoting *Lujan*, 504 U.S. at 560–61). Plaintiffs "must establish standing for each rem-edy sought, including declaratory and injunctive relief." *Dig. Recognition Network*, 803 F.3d at 956 (internal citations omitted).

   A.   Sovereign Immunity

Plaintiffs seek injunctive relief against multiple defendants including the State of Arkansas, the Governor of Arkansas, the Arkansas Attorney General, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board. These Defendants, however, are entitled to sovereign immunity and should be dismissed as a matter of law.

"The Eleventh Amendment confirms the sovereign status of the States by shielding them from suits by individuals absent their consent." *Dig. Recognition Network*, 803 F.3d at 956 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)). It also bars suits "against state officials if 'the state is the real, substantial party in interest.'" *Dig. Recognition Network*, 803 F.3d at 956 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984). An exception to this immunity was established in *Ex Parte Young* wherein the Court "held that a suit to enjoin a state official's enforcement of state legislation on the ground that the official's action would violate the Constitution is not a suit against the State, and is thus not barred by the Eleventh Amendment, so long as the official has 'some connection with the enforcement of the act.'" *Dig. Recognition Network*, 803 F.3d at 956-57 (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) (requiring "some connection to the enforcement of the challenged laws"). "Without that connection, the officer would be sued merely 'as a representative of the state' in an impermissible attempt 'to make the state a party.'" *Dig. Recognition Network*, 803 F.3d at 960 (quoting *Ex parte Young*, 209 U.S. at 157).  The State of Arkansas, the Governor of Arkansas, the Arkansas Attorney General, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board do not fall under the *Ex Parte Young* exception because they have no connection to the law Plaintiffs challenge.

1. *Official capacity suits*

Plaintiffs sued the Governor, but do not allege she has any concrete role in enforcing the statutes they challenge. They only allege three things about the Governor: (1) she is charged with the executive of authority for the state of Arkansas, (2) her role as chief executive overseeing law enforcement, and (3) she signed Act 629 into law. Compl. 5 ¶ 16. None of these allegations suffices to make out the requisite connection between Governor Sanders and the law Plaintiffs challenge.

As to the Governor's general-enforcement authority under the Arkansas Constitution, it is well-settled that a "governor's general-enforcement authority is not 'some connection' to enforcement" of a particular law, unless "that authority gives the governor *methods* of enforcement" for that law. *Church v. Missouri*, 913 F.3d 736, 749 (8th Cir. 2019). Plaintiffs cite no provision stating the Governor has to enforce the laws they challenge; they cite only the Governor's role as chief law enforcement authority itself. But neither "a broad duty to uphold state law," nor "general supervisory power over the persons responsible for enforcing the challenged provision will . . . subject an official to suit." *Id.* (quotation marks omitted) (first quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 517 (5th Cir. 2017); and then quoting *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)). Indeed, the Eighth Circuit has specifically held that "the executive authority of the [Arkansas] governor" under the Arkansas Constitution is not the sort of connection to challenged state law or policy that *Ex parte Young* requires. *Dig. Recognition Network*, 803 F.3d at 960. The Governor's general-enforcement authority does not make her a proper defendant to this lawsuit.

Moreover, the Governor's power to simply sign a new law does not support Plaintiffs' claims as against her. After all, if the Governor's signing authority sufficed, then "the constitutionality of every act passed by the legislature could be tested by a suit against the governor." *Dig.*

*Recognition Network*, 803 F.3d at 961 (quoting *Fitts v. McGhee*, 172 U.S. 516, 530 (1899)).  Not only has the Eighth Circuit rejected, as a general matter, such a broad approach to suing governors, but it has *specifically held* that the Governor of Arkansas was not a proper defendant in a suit challenging an Arkansas law because he lacked enforcement authority under that statute. *Id.* at 960–62.  If signing authority were sufficient to make the Governor a proper *Ex parte Young* defendant, *Digital Recognition Network* would have come out the other way.

Similarly, the Attorney General is immune from Plaintiffs' claims.  Plaintiffs allege that the Attorney General is a named Defendant only due to his enforcement responsibilities regarding Act 629. Compl. 5 ¶ 17. Section 17 of the Act provides: "Contingent effective date. Sections 8–16 of this act shall become effective only upon the certification of the Arkansas Attorney General that the State of Arkansas is currently enjoined from enforcing Sections 2–7 of this act relating to delta-8 tetrahydrocannabinol and delta-10 tetrahyrdocannabinol, but no earlier than August 1, 2023." *See* Ex. C.  This authority does not allow Plaintiffs to sue the Attorney General.

Very clearly, the Act does not give the Attorney General any enforcement authority. Instead, the Act merely sets forth a trigger mechanism for the effective date of Sections 8–16 of the Act. The only action permissible is to issue a certification, which could only be based upon a finding of a court of competent jurisdiction that the State of Arkansas is enjoined from enforcing Sections 2–7. The term "certification" means "[t]he act of attesting; esp., the process of giving someone or something an official document stating that a specified standard has been satisfied." Black's Law Dictionary (11th ed. 2019). In contrast, "enforcement" is defined as "the act or process of compelling compliance with a law, mandate, decree, or agreement." Black's Law Dictionary (11th ed. 2019).

Clearly, issuing a certification is not equivalent to enforcement authority. The Eighth Circuit's opinion in *Digital Recognition Network* is instructive. There the Court held that "[t]he Arkansas attorney general's authority to advise state officials on the constitutionality of [a state statute], by itself, does not suffice to establish 'some connection with the enforcement' of [that state statute]." 803 F.3d at 962. The Eighth Circuit also held the Arkansas Attorney General was not a proper defendant in a challenge to an Arkansas statute, because the Attorney General lacked authority to enforce it. *Dig. Recognition Network*, 803 F.3d at 962. Of note, at present, the Attorney General has no authority to issue such a certification.

Like the Governor, the Attorney General lacks any connection to enforcing Act 629. Therefore, neither official is a proper defendant under *Ex parte Young*.

### 2.  *State of Arkansas and State Agencies*

Along with the thirty state employees sued in their respective official capacities, Plaintiffs name as defendants "The State of Arkansas" and four of her political subdivisions:  the "Arkansas Department of Finance and Administration" and one of its boards, the "Arkansas Tobacco Control Board;" and the "Arkansas Department of Agriculture" and one of its boards, the "Arkansas State Plant Board."  Compl. 5 ¶ 15, 10 ¶¶ 46-49.

The law regarding sovereign immunity and suits against state officials or its agencies is well-settled. *Monroe v. Arkansas State Univ.*, 459 F.3d 591, 594 (8th Cir. 2007).  The Eighth Circuit has declared that "state officials may be sued in their *official* capacities" as individuals, of course.  *Id.* (emphasis added) (highlighting the concrete precedent and doctrine set forth by the United States Supreme Court in *Ex parte Young*, *supra*).  The Eighth Circuit has made it abundantly clear: "the same doctrine does *not* extend to states or state agencies." *Id.* (emphasis added) (quoting *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 443 F.3d 1005, 1017 (8th

Cir. 2006), *vacated on other grounds*, 551 U.S. 159 (1978), which posits that "only state officials, as opposed to state agencies, can be sued for prospective injunctive relief . . . ."). Moreover, the Eighth Circuit routinely holds that "[s]tates are immune from claims . . . unless the state has *expressly* waived immunity." *Bunch v. University of Ark. Board of Trustees*, 863 F.3d 1062, 1067 (8th Cir. 2017). Plaintiffs, however, list as defendants four "arms of the state," and the state itself, without identifying any individual representative.

Although the *Ex parte Young* exception to sovereign immunity allows the Plaintiffs to name an individual and point to their "connection with enforcement of the [challenged] act," *Digital Recognition Network*, 803 F.3d at 956–57, here, Plaintiffs have named zero individuals acting in their official capacities over those four political subdivisions of the state of Arkansas. If no such naming or connection exists, that official "'is merely . . . a representative of the state,' and Eleventh Amendment immunity applies." *Duit Const. Co. Inc. v. Bennett*, 796 F.3d 938, 940 (8th Cir. 2015) (quoting *Ex parte Young*, 209 U.S. at 157)).

B.  No Standing

Plaintiffs lack standing to bring this lawsuit against the Governor of Arkansas, the Arkansas Attorney General, the State of Arkansas, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board. *See Dig. Recognition Network*, 803 F.3d at 957 ("In a case like this one, the questions of Article III jurisdiction and Eleventh Amendment immunity are related."); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020) ("[T]here is 'significant overlap' between [the] standing and *Young* analyses."). Because the Governor and the Attorney General lacked a connection with enforcement of the law in *Digital Recognition Network*, the Eighth Circuit held there was no "'causal connection' between the injury and the defendant[s'] conduct." 803 F.3d at

957 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The same is true here. Neither the Governor nor the Attorney General has any role in enforcing the laws that Plaintiffs challenge. So just as in *Digital Recognition Network*, "the injury of which [Plaintiffs] complain[] is not 'fairly traceable' to either official." *Id.*  "For the same reasons, it is not likely that [Plaintiffs'] injury would be 'redressed by a favorable decision.'" *Id.* at 958 (quoting *Lujan*, 504 U.S. at 561).  Because the Governor and the Attorney General "do not enforce" any of the relevant laws, a judgment against them "would not meet the requirement of redressability." *Id.* at 959.

For the same reasons, Plaintiffs lack standing to bring this lawsuit against the State of Arkansas, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board.

Whether treated as a failure to satisfy *Ex parte Young* or Article III's standing requirements, the undisputed facts demonstrate that Plaintiffs have failed to prove that the Governor, the Attorney General, the State of Arkansas, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board have a sufficient connection with enforcement of the laws they challenge.  As a result, they are not proper defendants and are entitled to judgment as a matter of law.

## II.   PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN ON ENTITLEMENT TO A PRELIMINARY INJUNCTION

When considering a motion for preliminary injunction, courts weigh four factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

23

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of a preliminary injunction, and they must make "a clear showing" they have carried that burden. *Id*. at 22; *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). That burden is made even more difficult to bear when, as here, Plaintiffs seek to preliminarily enjoin "the implementation of a duly enacted state statute." *Planned Parenthood Minn., N.D, S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). They must make a "rigorous threshold showing" that it is "likely to prevail on the merits." *Id.* That requirement guards against attempts to "thwart a state's presumptively reasonable democratic processes." *Id*. at 733. "A more rigorous standard 'reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" *Id*. at 732 (quoting *Able v. U.S.*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)). Moreover, Plaintiffs' burden "is a heavy one where, as here, granting the preliminary injunction will give [Plaintiffs] substantially the relief it would obtain after a trial on the merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).

Further, in this context, "likely" does not merely mean "a fair chance of prevailing on the merits, with a fair chance meaning something less than 50 percent." *Id*. at 730 (internal quotation marks omitted). Rather, the movant must prove that it is more likely than not to prevail on the merits before a court may grant relief, *see id*. at 731–32, though courts remain free to *deny* a motion solely on the basis of a lack of irreparable harm, without reaching the merits. *See id*. at 732 n.5 ("[I]n some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis. In this respect, where a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction." (internal citation omitted)).

24

Here, Plaintiffs failed to meet their burden to demonstrate that these factors favor such an "extraordinary" form of relief. *Winter*, 555 U.S. at 24. Nor can they because each of those factors weighs against injunctive relief in this case.

A.  Plaintiffs have not shown a probability of success on the merits of their claims

Plaintiffs cannot establish any of the allegations upon which they contend Act 629 is unconstitutional. First, they contend the act is preempted by the 2018 Farm Bill, and thus, violates the Supremacy Clause. However, as expressed above the 2018 Farm Bill expressly states that it does not "preempt[] or limit[] any law of a State or Indian tribe that—(i) regulates the production of hemp; and (ii) is more stringent than this subchapter." 7 U.S.C. § 1639p(a)(3). Instead, States are permitted to ban the production of hemp all together. 7 U.S.C. § 1639p(f). Stemming from this allegation, Plaintiffs contend Act 629 alters the definition of hemp to criminalize and reclassify certain hemp-derived cannabinoids, including Delta-8, as illegal controlled substances. A side-by-side comparison of the definitions of hemp under Section 2 of Act 629 and 7 U.S.C. 1639o(1) demonstrate this is incorrect.

| Act 629 | Arkansas Law | Federal Law |
|---|---|---|
| Section 2<br><br>Definition of Hemp<br><br>Arkansas Industrial Hemp Production Act | A.C.A. § 2-15-503(5)<br><br>"Industrial hemp" means the plant Cannabis sativa and any part of the plant, including the seeds of the plant and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a total delta-9 tetrahydrocannabinol concentration of no more than three-tenths of one percent (0.3%) of the hemp-derived cannabidiol on a dry weight basis, unless specifically controlled under the Uniform Controlled Substances Act, § 5-64-101 et seq. | 7 U.S.C. 1639o(1)<br><br>The term "hemp" means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. |

Second, Plaintiffs contend Act 629 violates the Commerce Clause because it impermissibly restricts the interstate commerce of hemp. However, Section 7 of Act 629 satisfies the requirements of the 2018 Farm Bill regarding the transportation and shipment of hemp as defined in 7 U.S.C. 1639o(1).

| Act 629 | Arkansas Law | Federal Law |
|---|---|---|
| <u>Section 7</u><br><br>Uniform Controlled Substances Act – Substances in Schedule VI regarding Transportation and Shipment | A.C.A. § 5-64-215(d)<br><br>(d) This section does not prohibit the continuous transportation through Arkansas of the plant Cannabis sativa L., and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis, produced in accordance with 7 U.S.C. § 1639o et seq. | 7 U.S.C. 1639o<br>Statutory Notes and Related Subsidiaries – Interstate Commerce<br>Pub. L. 115–334, title X, §10114, Dec. 20, 2018, 132 Stat. 4914<br><br>''(a) RULE OF CONSTRUC-TION.—Nothing in this title or an amendment<br>made by this title prohibits the interstate commerce of hemp (as defined in section 297A of the Agricultural Marketing Act of 1946 [7 U.S.C. 1639o] (as added by section 10113)) or hemp products.<br>''(b) TRANSPORTATION OF HEMP AND HEMP PRODUCTS.—<br>No State or Indian Tribe shall prohibit the transportation or shipment of hemp or hemp products produced in accordance with subtitle G of the Agricultural Marketing Act of 1946 [7 U.S.C. 1639o et seq.] (as added by section 10113) through the State or the territory of the Indian Tribe, as applicable.'' |

Act 629 neither violates the Supremacy or Commerce Clause. The law very clearly permits the production of hemp with a total delta-9 tetrahydrocannabinol concentration of no more than three-tenths of one percent (0.3%) of the hemp-derived cannabidiol on a dry weight basis, unless specifically controlled under the Uniform Controlled Substances Act, § 5-64-101 et seq.

Plaintiffs complain further that the legislature invents a distinction for "synthetic" hemp derived from cannabinoids. This as well is inaccurate. As demonstrated above, synthetic cannabinoids are recognized by the federal government. While THC can be extracted from the cannabis plant, it can also be completely chemically manufactured in a laboratory. As explained by the DEA:

> The CSA classifies tetrahydrocannabinols (THC) as controlled in schedule I. 21 U.S.C. § 812, Schedule I(c)(17); 21 CFR 1308.11(d)(31). Subject to limited exceptions, for the purposes of the CSA, the term "tetrahydrocannabinols" means those "naturally contained in a plant of the genus Cannabis (cannabis plant), as well as synthetic equivalents of the substances contained in the cannabis plant and/or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity to those substances contained in the plant." 21 CFR § 1308.11(d)(31).

Because Delta-9-THCO and delta-8-THCO do not occur naturally in the cannabis plant and can only be obtained synthetically, and therefore do not fall under the definition of hemp.

Derivative of this allegation is Plaintiffs' contention that the regulatory scheme of Act 629 results in impermissible regulatory taking, effectively creating a total ban on hemp containing any amount of THC and thus infringing on Plaintiffs' business. This argument is absurd.

The Fifth Amendment of the U.S. Constitution "prohibits the taking of private property 'for public use, without just compensation.'" *Southeast Arkansas Hospice, Inc. v. Burwell, et al.*, 815 F.3d 448, 450 (8th Cir. 2016). "While property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id*. (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). The Supreme Court analyzes the following factors to distinguish regulation from a regulatory taking: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Id*.

27

Plaintiffs have not met their burden to prove any provision of Act 629 constitutes a taking. First, the regulatory aspect of the Act is not currently in force. However, Plaintiffs assume Sections 2-7 of the Act will be found unconstitutional, and therefore, direct the Court to the regulatory section of the Act, stating, "Specifically, Section 10 permits the sale of hemp-derived products, but it states that a hemp-derived product 'shall not be combined with or contain any of the following: . . . any amount of tetrahydrocannabinol.' This effectively bans all hemp-derived products containing [THC] even if the product contains 0.3% or less of delta-9 THC." Pl.'s Bri. 19. To evaluate this allegation, the Court must review Ark. Code Ann. 20-56-403 under Section 10 of the Act in its entirety:

> **(a)** A hemp-derived product shall not be delivered, sold, bought, or used in this state except in conformity with all applicable laws and regulations, including this subchapter and any rules promulgated under this subchapter.
> **(b)** A person shall not sell a hemp-derived product without being permitted by Arkansas Tobacco Control.
> **(c)** A product intended for human consumption or inhalation that is derived from hemp and contains tetrahydrocannabinol shall not be permitted or allowed under the laws of this state, other than hemp-derived products if otherwise legal under state law.
> **(d)**
> > **(1)** A hemp-derived product shall not be combined with or contain any of the following:
> > > **(A)** Any liquid, hydrocolloid, animal-based substance, thickener, sweetener, flavoring, synthetic product, propylene glycol, vegetable glycerin, or other non-hemp-derived substance;
> > > **(B)** Nicotine or tobacco; or
> > > **(C) Any amount of tetrahydrocannabinol as to create a danger of misuse, overdose, accidental overconsumption, inaccurate dosage, or other risk to the public.**
> > **(2)** Medical devices, prescription drugs, or drugs otherwise approved by the United States Food and Drug Administration shall not be considered hemp-derived products.
> **(e)** The business of handling, receiving, possessing, storing, distributing, taking orders for, soliciting orders of, selling, offering for sale, and dealing in, through sale, barter, or exchange, hemp-derived

> products is declared to be a privilege under the Arkansas Constitu-
> tion and laws of the State of Arkansas.

Acts 2023, No. 629, § 10 (emphasis added). A complete review of this provision shows it does not

ban all hemp-derived products containing THC.

The intent of Section 10 is to regulate "certain hemp-derived products to: (1) Prevent the

sale and use of illicit hemp-based productions within Arkansas; and (2) Protect and promote the

public health and welfare of the residents of this state." Acts 2023, No. 629, § 10, codified at Ark.

Code Ann. § 20-56-401, *et seq.*  Plaintiffs presented no rational evidence to suggest the regulations

make it impossible "to profitably engage in their business." *Burwell*, 815 F.3d at 450 (citing *Key-*

*stone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485 (1987)). The declarations sub-

mitted by Plaintiffs in support of their motion claim the regulations would cause their respective

employees to face criminal liability for transporting and shipping hemp products if they fail to

demonstrate products "were in continuous transportation" and "produced in accordance with 7

U.S.C. § 1639o, et seq." This provision (Section 7) mirrors the federal law prohibiting the state

from banning the interstate transportation and shipment of hemp and hemp products "in accord-

ance with subtitle G of the Agricultural Marketing Act of 1946 [7 U.S.C. 1639o et seq.]." They

also contend this exposes their investment and renders their inventory of hemp-derived products

worthless in Arkansas. This contention too is illogical because there is no ban on the production,

sale, or interstate transportation of hemp as defined by Arkansas and federal law. For the same

reasons, the regulations do not interfere with Plaintiffs' investment-backed expectations.

As a final claim, Plaintiffs allege Act 629 is unconstitutionally vague under the Due Pro-

cess Clause of the Fifth and Fourteenth Amendments. This allegation too is without merit. There

has not been a change in the definition of "industrial hemp" to impact the ability of farmers to

continue to grow hemp. As before August 1, 2023, farmers are still allowed to cultivate hemp so

long as the delta-9 tetrahydrocannabinol concentration is not more than three-tenths of one percent (0.3%) on a dry weight basis, and it produced in accordance with 7 U.S.C. § 1639o *et seq*.

Further, though the regulatory section is not in effect, the term "psychoactive substance" is recognized in the industry. The DEA defines a "psychoactive substance" as a mind-altering drug.[31] "The defining difference between hemp and marijuana is their psychoactive component: tetrahydrocannabinol, or THC. Hemp has 0.3% or less THC, meaning hemp-derived products don't contain enough THC to create the "high" traditionally associated with marijuana."[32]

The final argument regarding vagueness regarding the effective dates of certain sections was corrected by the Arkansas Code Revision Committee, as noted above, and is therefore moot.

B.  <u>Plaintiffs will not be irreparably harmed in the absence of a preliminary injunction</u>

"Regardless of the strength of its claim[s] on the merits, a movant for a preliminary injunction should show a threat of irreparable harm." *See Gen Motors Corp.*, 563 F.3d at 318 (citing *Dataphase*, 640 F.2d at 113). To do so, a plaintiff must show "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). The absence of such harm "is an independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

As fully set out above, the alleged harm in this case is based on an incorrect reading of Act 629. Plaintiffs argue the Act stifles their businesses and renders their inventory worthless, but the

---

[31] Marijuana/Cannabis, DOJ/DEA Drug Fact Sheet, https://www.dea.gov/sites/default/files/2020-06/Marijuana-Cannabis-2020_0.pdf.

[32] https://msutoday.msu.edu/news/2021/cbd-marijuana-and-hemp#:~:text=Hemp%20has%200.3%25%20or%20less,high%E2%80%9D%20traditionally%20associated%20with%20marijuana.

allegations made to prop up those claims are unfounded. Simply put, assuming Plaintiffs were already compliant with Arkansas law in their cultivation and sale of hemp products, there should be no change in their business. If instead their inventory contains synthetic cannabinoids that exceeds the required concentration of delta-9 THC, it is already illegal under both Arkansas and federal law.

C. <u>The balance of the equities and the public interest do not support a preliminary injunction</u>

Even if Plaintiffs had shown a probability of success on the merits or irreparable harm—which they did not—the remaining *Dataphase* factors would strongly weigh against their requested preliminary injunction. Federal law permits Arkansas to create more stringent laws regarding the regulation of hemp. In this instance, the General Assembly lawfully enacted Act 629, which is constitutionally sound in every respect. Harm would result to the defendants if Plaintiffs were permitted to thwart the state's presumptively reasoned democratic processes, which are entitled to a higher degree of deference and should not be enjoined lightly.

CONCLUSION

For the above-stated reasons, Plaintiffs' case as against the State of Arkansas, the Governor of Arkansas, the Arkansas Attorney General, the Arkansas Department of Finance and Administration, the Arkansas Tobacco Control Board, the Department of Agriculture, and the Arkansas State Plant Board should be dismissed on immunity and standing.

As against the prosecuting attorneys, Plaintiffs' Motion for Temporary Restraining Order or Alternative Motion for Preliminary Injunction should be denied.

Respectfully submitted,

TIM GRIFFIN
Attorney General

*Jordan Broyles*
Jordan Broyles, Ark Bar No. 2015156

Senior Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-9482
Fax: (501) 682-2591
Email: jordan.broyles@arkansasag.gov

*Attorneys for all Defendants*

## CERTIFICATE OF SERVICE

I, Jordan Broyles, hereby certify that on August 8, 2023, I electronically filed the foregoing pleading on behalf of all Defendants using the CM/ECF system, which will send notifications to all attorneys of record.

*Jordan Broyles*
Jordan Broyles