1         IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF ARKANSAS
2              CENTRAL DIVISION

3  BIO GEN LLC, et al

4          Plaintiffs
      Vs.              No. 4:23-cv-00718-BRW
5                   August 23, 2023
                    Little Rock, Arkansas
6  SARAH HUCKABEE SANDERS, et al  2:10 p.m.

7         Defendants

8

9  TRANSCRIPT OF PLAINTIFFS' PRELIMINARY RESTRAINING ORDER

10        DEFENDANTS' MOTION TO DISMISS

11     BEFORE THE HONORABLE BILLY ROY WILSON

12       UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  On Behalf of the Plaintiffs:

16     ABTIN MEHDIZADEGAN
       ALLISON TSCHIEMER SCOTT
17     Hall Booth Smith, PC
       200 River Market Avenue, Suite 500
18     Little Rock, Arkansas 72201

19  On Behalf of the Defendants:

20     JORDAN BROYLES
       CHRISTINE ANN CRYER
21     Arkansas Attorney General's Office
       323 Center Street, Suite 200
22     Little Rock, Arkansas 72201

23

       Proceedings reported by machine stenography and
24  displayed in realtime; transcript prepared utilizing
  computer-aided transcription.

25

**EXHIBIT**

**1**

Valarie D. Flora, FCRR, TX-CSR, AR-CCR
United States Court Reporter
Valarie_Flora@ared.uscourts.gov (501) 604-5105

```
1                        I N D E X

2    WITNESS FOR PLAINTIFF:      DIRECT    CROSS      REDIRECT

3    MARK KRAUSE                   31        52

4    BILL MORGAN                   76        81

5    SCOUT STUBBS                  85        92

6    MARJORIE SZARMACH             97        99       103

7    EXHIBITS RECEIVED:

8    Plaintiffs' Exhibits

9    1 ...................................................  35

10   2 ...................................................  36

11   3 ...................................................  47

12   Defendants' Exhibits

13   A ...................................................  60

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE COURT:  Be seated, please.  Good afternoon.
Parties ready?

MR. MEHDIZADEGAN:  Yes, Your Honor.

MS. BROYLES:  Yes, Your Honor.

THE COURT:  We're here in Bio Gen, LLC, et al
against Governor Sarah Huckabee Sanders and others, Case
Number 4:23-cv-00718.

We're here to hear plaintiffs' motion for a
preliminary restraining order and defendants' motion to
dismiss.  The plaintiffs are represented -- I'm going to
have to have help with this -- by Mr. Mehdizadegan.

MR. MEHDIZADEGAN:  Mehdizadegan, Your Honor, but
it's about a five-year learning curve and you're well
ahead of it.  Abtin is fine.  Thank you, Your Honor.

THE COURT:  Can I call you Mr. M?

MR. MEHDIZADEGAN:  That's perfect, Your Honor.
Yes.

THE COURT:  You know, I'm from Scott county over
in western Arkansas.  Everybody there is named Wilson,
Green or Brown or Jones or something like that.

MR. MEHDIZADEGAN:  Your Honor, I am running a
sale on vowels.  If you need one, I'm happy to sell.  I've
got some spares.

THE COURT:  Defendants are represented by Ms.

1  Broyles and Ms. Cryer.

2          MS. BROYLES:  Yes.

3          MS. CRYER:  Yes, Your Honor.

4          THE COURT:  All right.  I guess I'll hear a

5  motion to dismiss first on behalf of the Governor.

6          MS. BROYLES:  See how long I make it standing

7  up.

8          THE COURT:  You could be seated if you wanted

9  to.

10          MS. BROYLES:  I'm going to try to start this

11  way.  And if I can't, then I'll sit down but I think I'm

12  okay so far.

13      Can you hear me all right?

14          THE COURT:  Can I hear you all right?

15          MS. BROYLES:  Yeah.

16          THE COURT:  Yeah.  I can hear you pretty good,

17  but I also look at my -- you know it's typed up over here.

18  I got real-time, so I might look over there.  Hope it's

19  not too distracting if I don't look at you while you're

20  talking.

21          MS. BROYLES.  No.  I understand.  I'm glad you

22  told me though.  I appreciate it.

23          THE COURT:  As they say in Scott county, I'm

24  kindly deef.

25          MS. BROYLES:  Well, Your Honor, starting with

1  the motion to dismiss, is it okay if in that regard that I

2  also touch on the private right of action aspect or would

3  you like for me to wait?  I know it's --

4          THE COURT:  Motion dismiss first.

5          MS. BROYLES:  Okay.  I think the briefing more

6  or less covers most of the issues, but in general

7  plaintiffs have sued a number of actors, primarily the

8  prosecuting attorneys of the State of Arkansas, included

9  as well in their initial complaint was the State of

10 Arkansas, Governor Sanders, Attorney General Griffin, and

11 then various state agencies.

12     After we filed our motion to dismiss, they amended

13 the complaint to remove the State of Arkansas.  And so the

14 replies for the motion to dismiss covers the fact that -

15 again, I realize that directors and such were added, but

16 the original motion to dismiss should still apply to

17 Governor Sanders as well as Attorney General Griffin.

18     As is stated in the amended complaint as well as the

19 original complaint, there is no enforcement mechanism

20 under which either the Attorney General or the Governor

21 will have any enforcement authority under this act.

22          THE COURT:  Is either the same thing as either?

23          MS. BROYLES:  Either/either, yes, sir.

24     But that said, so because there's no enforcement

25 authority under the act, the Ex parte Young exception to

1    the Eleventh Amendment does not apply, they continue to be
2    entitled to sovereign immunity.
3         And I can go through all the case law and things of
4    that nature, but generally speaking, the plaintiff
5    actually never responded to the original argument that was
6    raised in the motion to dismiss.  They said, essentially,
7    that having amended the complaint, that our motion was
8    moot.  I appreciate that argument with respect to the
9    agencies, but as it pertains to the Governor as well as
10   the AG, there's been no response to really dispute the
11   cases that I've identified.
12        The case law that is there as well shows that,
13   specifically for governors, just the simplicity of signing
14   a bill into law is not enough to qualify as enforcement.
15   And then with respect to Attorney General Griffin, he
16   again has no enforcement authority under the act.  It's
17   minimally just a certification that, if you were to
18   determine that the Sections 2 through 7 of the act are
19   found to be unconstitutional or void or what have you, all
20   he would do is to certify that for the purpose of
21   triggering the regulatory scheme under the law.
22        So there being no response or really objection to
23   those -- the law as well as our arguments on the issues as
24   they pertain to the Governor as well as the AG, I think
25   they're entitled to dismissal at this time.

```
 1          And just for the purpose of the record, I further
 2   incorporate our brief regarding the private right of
 3   action, that that similarly be applied to these
 4   defendants.
 5               THE COURT:  Thank you.
 6               MS. BROYLES:  Can I answer any questions for you
 7   or --
 8               THE COURT:  No, ma'am.  Thank you.
 9               MR. MEHDIZADEGAN:  May I approach, Your Honor?
10          Good afternoon, Your Honor.  My name is Abtin
11   Mehdizadegan.  I appreciate the courtesy instruction from
12   the chambers earlier to slow down.  Being from the
13   northeast, I tend to speak too fast.  And if I do move too
14   fast, please feel free to interrupt me.
15          I want to begin, Your Honor, by introducing the folks
16   we have here today with us.  Number one, I'm joined by
17   Allison Scott, my co-counsel in this case.  Together we
18   have the privilege of representing the plaintiffs in this
19   action.  I want to take moment just to introduce you to
20   them before addressing legal arguments if I may.
21               THE COURT:  To introduce what?
22               MR. MEHDIZADEGAN:  The plaintiffs to you.
23               THE COURT:  Oh, sure.
24               MR. MEHDIZADEGAN:  Thank you, Your Honor.  I
25   think it's important that you hear who these people are
```

1 before we proceed into the motion to dismiss argument

2 because I think it will add context that's missing here.

3     This case is personal to them.  Everyone here has

4 traveled long and far to be here because their livelihoods

5 are at stake.

6     Bill Morgan, the gentleman in the blue shirt, owns

7 Bio Gen LLC.  A more forthright statement might be, Your

8 Honor, is he is Bio Gen LLC.  He is a farmer and he is the

9 sole member of that company and has invested his entire

10 life savings into Arkansas' hemp program.  He would like

11 to tell you about how Act 629 has and continues to harm

12 his business.

13     He's a very fascinating character.  I've enjoyed

14 every minute I've spent with him.  He reads French poetry

15 to his plants.  He lives among the plants and he cares for

16 them and tends to them.  I think he is the view --

17 embodies the view of American democracy in the agrarian

18 sense and the protections intended to benefit farmers in

19 the constitution, that formed the foundation of the

20 constitution.

21     THE COURT:  Did you say he reads French poetry

22 to his plants?

23     MR. MEHDIZADEGAN:  You heard me correctly, Your

24 Honor, yes.

25     THE COURT:  What does that do for them?

1          MR. MEHDIZADEGAN:  I think he'd like to tell you

2     about that.

3          Scout Stubbs, the woman in the red dress and black

4     shirt, owns Drippers Vape Shop.  She's a hemp product

5     manufacturer and retailer.  She'll tell you that she

6     manufacturers hemp products because she cares about their

7     components.  She believes in making sure these are -- she

8     believes in being a responsible manufacturer.  Her

9     children use some of the products she manufacturers -- or

10    they did until Act 629 stopped her business in its shoes.

11         She'll tell you and testify about Arkansas' recent

12    enforcement action against her I think undercut several of

13    the arguments and substance the defendants have made here.

14    I think her testimony will help elucidate both our void

15    for vagueness arguments.  In addition to our void for

16    vagueness argument, Ms. Stubbs will also identify and

17    illustrate how Act 629 interferes with her ability to

18    transact in interstate commerce.  She deals with

19    businesses in Oregon, Colorado, and Arkansas.

20         Marjorie Szarmach, the woman seated directly next to

21    Allison Scott, is the senior vice president and part owner

22    of Smoker Friendly or the entity that does business as

23    Smoker Friendly.  Smoker Friendly operates in 58 different

24    locations in Arkansas, all of them -- all of them are age

25    restricted.  The hemp-direct products that they sell per

quarter amount to $300,000 of inventory.

On July 31st that inventory had value, $300,000. That inventory had value on July 31st, and on August 1st, when she woke up, gone, worthless. Not only worthless, they don't know what to do with it because the law also criminalizes the possession of these substances that were -- that were up until the 31st fully legal.

More than that, no one here understood or was aware that the revision commission would change the trigger clause sections that were affected. I want to point out specifically that the trigger clause dealt with Sections 2 through 5 of Act 629. Sections 6 and 7 amended the criminal code and added decentralized products to that criminal statute.

The commission did not provide notice of the changes they made. No one had notice of those criminal penalties until the State filed its response because the commission provides no notice to the public, no notice to the public that having these products that were legal on the 31st of July were now illegal and could land them in jail on August 1st.

Finally, Your Honor, I'd like to introduce you to Mark Krause. Mark Krause is an expert we would like to tender for the purposes of this hearing. I understand the requirements of expert reports. I'll address that on the

1    front end, we don't have one.  We're at a temporary

2    hearing today.  And while we don't have an expert report,

3    we do have the other -- the information that the Court

4    would need to understand his background and his training.

5        He is a chemist.  He owns a laboratory and he's done

6    this --

7            THE COURT:  Need to slow down just a little if

8    you will.

9            MR. MEHDIZADEGAN:  Yes, Your Honor.

10       Mr. Krause is a chemist.  He's been a chemist for 40

11   years.  He's run a lab for 35 years.  For the entire

12   duration of his career, he has been involved in the work

13   of analytical chemistry, both food grade and nonfood grade

14   testing, sometimes for the USDA and for others.  Since

15   2018, Mr. Krause has come to the forefront of the hemp

16   products market and is an expert in his field.

17       Mr. Krause's testimony I believe will be essential to

18   this Court's understanding of how Arkansas' changed

19   definition of the term "hemp" impacts chemists and the

20   folks that chemists work with like all the plaintiffs

21   here.

22       I do want to directly address the motion to dismiss.

23   Frankly, in all due respect to my counsel across the

24   table, I think the arguments that the Governor and the

25   Attorney General are immune from suit are offensive; not

offensive to me, but offensive to that flag and everything that our democracy is founded on.

As early as our nation's history 300 years ago in *Marbury versus Madison*, we understood the federal supremacy -- power of the federal government.  In 1906, we understood -- I truly don't understand the arguments as to the Attorney General.  *Ex parte Young* is a case where Minnesota --

THE COURT:  My friend said I might not understand that case because it was decided after I was in law school.  And since it was decided in I believe 1908, I went to law school after that.

MR. MEHDIZADEGAN:  Yes, Your Honor.  I think I did too just a little bit later.

*Ex parte Young* involved Minnesota enacting a statute that limited what rates railroads could charge.  In addition to that, it imposed civil and I believe criminal penalties, but I know off the top of my head civil penalties, stiff civil penalties.

The carriers, the day before this new Minnesota law was set to take effect, just like the plaintiffs here, filed suit in federal district court.  The Attorney General moved to dismiss under the Eleventh Amendment and argued the federal court had no jurisdiction over it.  The federal judge held the Attorney General in contempt

appropriately because the Attorney General of Minnesota
pronounced his expectation he would not comply with the
federal court's order.

The case eventually reaches the Supreme Court.  And
the Court plainly holds that the Attorney General of
Minnesota and the Attorney General of Arkansas, every
attorney general who is an official state actor, can be
sued if they have a role in the enforcement of the
statute.

The Attorney General most certainly has a role in the
enforcement of the statute.  He is the chief law
enforcement officer of the State.  Charging decisions, in
some respects as to the criminal appellate division
certainly and some criminal matters as well, the Attorney
General is intimately involved.  But more than that, the
statute specifically contemplates the Attorney General's
role in certifying -- in certifying whether or not
injunction is ordered.  So that would affect the trigger
clause.  If I didn't name the Attorney General, the
argument you would hear the State make is, I failed to
join a necessary, indispensable party.

The Attorney General was a necessary part of this
lawsuit.  It's not that we wanted to sue the Attorney
General in his official capacity; it's that we needed to
because he is a necessary component along the chain of

1  enforcement.

2      The same is true for the Governor, Your Honor.  The

3  Governor directs the directors of ABC and ATC and the

4  Plant Board.  She is their boss.  She tells them what to

5  do, how to do it, and whether to enforce this law or not

6  and in what manner to enforce it.  That is her role.  She

7  is not contemplated necessarily within the statute by

8  name, but every one of the agencies that report to her are

9  definitely within the statute.  I think it's to the -- as

10 to the issue of the -- their appropriateness as defendants

11 in this case.

12     Again, I don't understand the State's position here,

13 and I think especially -- especially at the motion to

14 dismiss stage where we're dealing with a plausability

15 standard where all facts are deemed -- they're taken as

16 true, I think our complaint fully and adequately addresses

17 the specific context in which the Governor and the

18 Attorney General are involved here, not -- we didn't sue

19 the Governor because she signed the law.  We sued the

20 Governor because she is the boss of the folks who enforce

21 it.  The same is true of the Attorney General.

22     We'd ask you deny the motion to dismiss in its

23 entirety.

24     I do want to address one issue that the Attorney

25 General raised.  We did not address that specific argument

1  around *Ex parte Young* in the Governor's -- and the
2  Governor and the Attorney General's appropriateness to be
3  sued here because they didn't file any motion to dismiss.
4  There is new arguments in their reply.  And I don't have
5  an opportunity to file a sur-reply without seeking leave.
6  And, obviously, there are other matters that we needed to
7  brief.
8      I expected that the Attorney General would file a
9  motion to dismiss as it did first and at the appropriate
10 time I would make all of these arguments and outline the
11 case law for you.  I did not have that opportunity and I
12 respect the Court and tried not to raise new issues in
13 replies.  That's one issue.
14     At the same time, Your Honor, and if I may lead into
15 my discussion of the private cause of action.
16         THE COURT:  Okay.
17         MR. MEHDIZADEGAN:  The first seven pages or so
18 of that document relate specifically to these arguments
19 around *Ex parte Young*.  They cite *Ex parte Young* and we
20 address that fully as to the appropriateness of these
21 defendants.  I think *Ex parte Young* obviously has an
22 interplay with the ultimate question of whether a private
23 cause of action exists under the 2018 Farm Bill that could
24 be pursued through the procedural vehicle in Section 1983
25 or the through the implications doctrine.

1          I think all of these decisions -- again, I think this
2    is a relative straightforward case.  Congress passed a
3    law.  It preempted elements of that law.  Arkansas passed
4    a competing law that conflicts with it.  At the end of the
5    day, that's what we're here about.
6          As it relates to the private cause of action, we know
7    and *Ex parte Young* tells us this, as well as a number of
8    other Supreme Court decisions, that the Court has common
9    law federal supremacy power to enjoin State actions in
10   this way.
11         As it relates to the -- to the specific cause of
12   action question for 1983, to be honest, Your Honor, no
13   court has yet to find that.  There are at least two courts
14   to have addressed it.  Ironically, the *Dines versus Kelly*
15   case, the Kansas District Court case, address it and they
16   address it in the negative.  But an ironic piece of that
17   is that it also addressed whether the Governor of Kansas
18   was an appropriate party to be sued.  And that court said,
19   yes, an almost identical case.  Not completely identical
20   because our case has learned from the mistakes of those.
21   We've added more claims that I think give more life to our
22   lawsuit relative to those issues.
23         What I want to fundamentally outline is that in the
24   1984 action, there might be money damages available in
25   other cases.  We don't seek them here.  I think that's a

1  limiting principle that distinguishes this case from any

2  other that has appeared before the Court.

3      We know that there are rights-creating language in

4  the Farm Bill.  One court has recognized that.  The

5  district -- it's the *Serna* case, Your Honor.  I believe

6  the Tenth Circuit affirmed that decision.  Didn't address

7  that specific finding of the district court judge or the

8  magistrate judge, adopted the report, but there was an

9  explicit finding that the plaintiff in the *Serna* case, who

10 had his product seized at an airport, was suing under a

11 different theory, had a right -- a recognized right under

12 the 2018 Farm Bill.  One court has already found that.

13 These plaintiffs do too.  There's rights-creating language

14 in the 2018 Farm Bill.

15     I think -- I think the question of whether the Farm

16 Bill creates this private right of action that can be

17 pursued through 1983 or the implications doctrine is an

18 interesting --

19         THE COURT:  Slow down just a little.

20         MR. MEHDIZADEGAN:   -- is an interesting

21 question, but I would also like to invert the question to

22 an extent and focus first on Act 629.

23     This is a simple observation.  Act 629 has that

24 contingency language because the State expected and

25 invited a lawsuit.  The word "enjoined" is literally in

1  Act 629.  The State expected to be sued.  That's why they
2  passed two bills in one.
3      So I think -- we didn't raise this issue and have not
4  briefed it, but I think there's a kind of an extension of
5  the implications doctrine should be -- should be a
6  recognition that the State has implicitly waived sovereign
7  immunity in this way at least to an injunction.  If not,
8  again, the law says, 2 through 5 will be effective today,
9  And if it's enjoined and the Attorney General certifies
10  it, then 6 through 14 become effective.
11      They expected to be sued.  So I think that that's the
12  first place to start.  There is no question.  They knew
13  they would be here today.  This isn't a surprise.
14          THE COURT:  Slow down.
15          MR. MEHDIZADEGAN:  Thank you, Your Honor.  I
16  will.  I'm passionate about this because I care about
17  these people and I care about their businesses.  I will
18  slow down.
19      But the State knew it would be sued.  It expected to
20  be sued.  And by passing a law that the State knew
21  conflicted with federal law, it invited this lawsuit.
22      So I think if we look at these 1983 cases that deal
23  with these private causes of action are also cases that
24  deal with monetary damages.  We don't seek them here and
25  we're not entitled to them.  We don't want them.  All we

1    want to do is to be able to return to the status quo, to
2    allow these folks to go back to their lives while this
3    case is litigated.

4         So I think this is a unique distinction in our case
5    from all of the other 1983 and implication cases.  We're
6    only seeking injunctive relief.  This is more in line of
7    *Ex parte Young*.

8         But I also think this Court can and should, if there
9    is a case that could recognize private cause of action in
10   the limited since that we're asking for here, I think it's
11   this case, Your Honor.  Again, there's already
12   rights-creating language.  There is no expressed
13   limitation in the Farm Bill as to -- as to a private cause
14   of action.  And, conversely, I think it's fascinating.  I
15   tried to find any case that dealt with extrapolating
16   legislative intent where the chambers of the House and the
17   Senate passed competing bills and the conference process
18   adopt one provision over the other.  I didn't find
19   legislative history that dealt with that, but what I did
20   find is the legislative history of the Farm Bill.

21        The House version had a specific -- specific private
22   cause of action in it.  That part didn't make it to the --
23   to the public law.  But there's no legislative history or
24   information or material that expressly excluded it.  So I
25   think Congress could have said, no one can sue under the

1    Farm Bill.  There's no statement like that.  Congress
2    could have said as the House said, you can't sue under the
3    Farm Bill, but they didn't.
4        I think they did not do that because they didn't need
5    to because this -- the way the Farm Bill operates places
6    the States squarely in *Ex parte Young* territory; and if
7    not there, under the implications doctrine.
8        I think all of the Cort factors, C-o-r-t -- all of
9    the Cort factors militate in favor of a recognition that
10   there is a private cause of action limited as applied to
11   this case for 1983 or otherwise through this Court's
12   common law enforcement power.
13       But whether or not -- I think, Your Honor, whether or
14   not the Court decides that there is -- if it decides to
15   till that soil as I said in our brief, I -- again, I do
16   think this is the case to cultivate that case law.  But
17   whether or not the Court decides to go there, I still
18   think your common law authority to sit and protect the
19   State -- protect citizens from overzealous State actors
20   like these is well recognized, has been well recognized,
21   and should be continued to be enforced.
22           THE COURT:  Do you need a private right of
23   action under the Farm Bill for expressed preemption claim?
24           MR. MEHDIZADEGAN:  Your Honor, we don't think
25   there needs to be an expressed recognition of a private

cause of action.  And there are a number of cases that have found causes of action -- or have either applied them or recognized them even where there isn't direct expressed preemption language, but there is expressed preemption language in the Farm Bill.

Again, I think the House was probably thinking along the lines that you are, Your Honor.  I think the conference decided, we have 300 years of case law, we don't need to say it, it's obvious; of course, parties can sue to enjoin an illegal state action.

So I don't know that it needs to be stated, but I do think that, again, this being a unique case, there's not really any other cases that are quite like this one.

I would also point out a number of the cases that the Supreme Court has dealt with in this area are usually appropriations type bills.  The Court is not willing to recognize a 1983 action whether it's an appropriations -- on an appropriations bill like Medicare or Medicaid. That's not what we're talking about here.  We're talking about State-prohibited conduct.

Again, I think if you look at the genius of the Farm Bill the way it's laid out -- and I want to point out one of the arguments the State has made as to whether or not states have authority -- or whether the Farm Bill rather preempts state law.  The section that the State has cited

1   in its brief as to that point leaves off important

2   language.  It says that nothing in this subsection of that

3   part -- 297(a) of the Farm Bill -- I'll come back and

4   explain what I mean by that.  It says nothing in that

5   subsection limits or preempts state law.

6       That subsection is dealing with the states that want

7   to have primary regulatory authority over their state hemp

8   programs.  If that's all it's dealing with, implicit in

9   that is the states do not have primary regulatory

10  authority over hemp programs unless they've complied with

11  the Farm Bill's requirements and gave the Secretary of

12  Agriculture's approval.  If the state does not adopt a

13  compliant program or if the state violates the USDA's

14  program, it loses that regulatory authority, it loses that

15  primary authority.  And that limiting language as to

16  preemption is specific to 297(a).  297(b) deals with the

17  state -- with the federally-regulated programs.  And

18  297(c) deals specifically with interstate commerce.  It

19  states that nothing in the entirety of the section of the

20  law is intended to restrict or inhibit interstate

21  commerce.  And then in the expressed language in 297(c),

22  says that states shall not -- uses mandatory,

23  rights-creating language -- shall not interfere with the

24  interstate transportation of these federally legalized

25  hemp-derived products.

1      With that, Your Honor, I would -- we would urge the

2  Court to recognize -- not creating new law, but to

3  recognize that the law already entitles the plaintiffs to

4  the relief they have requested, whether it's under an *Ex*

5  *parte Young* theory or under 1983 for the limited purposes

6  of a continuing an injunction or by implication.  Under

7  each setting, Your Honor, I think the way this law is

8  written -- again, Act 629 was written with the idea that

9  they would be sued.

10      THE COURT:  I'll tell you I'm a little skeptical

11  of 1983, but I'll hear you out on it.

12      MR. MEHDIZADEGAN:  Again, I think a broad

13  statement that 19 -- that the Farm Bill was actually born

14  in 1983, that would probably be too far.  We're not asking

15  the Court to go there.  We don't want money damages,

16  which, again, is the prime focus of 1983.  All we want is

17  an injunction so that these people can go back to their

18  lives and so Bill Morgan go back to reading French poetry

19  to his plants.

20      Thank you, Your Honor.

21      May I answer any questions -- are there any questions

22  I can answer for you?

23      THE COURT:  Yeah.  I'd like to know where you

24  were raised up.  That's not just raised; that's raised up.

25      MR. MEHDIZADEGAN:  Your Honor, I was raised up

24

1    by a farmer, by a scientist that works for the USDA in

2    northern Maine a little farm called -- in Masardis, Maine.

3    There was a big potato blighted epidemic in 1991 in

4    northern Maine.  My dad has two PhDs.  He's very

5    disappointed that I became a lawyer.  One was in plant

6    pathology and one was in animal sciences.  And,

7    apparently, that mix made him the best person to help the

8    state of Maine and fight its blight epidemic and get the

9    state back to normal.

10        I grew up in Maine.  I went to the University of

11   Maine.  I found my way back here because that's where my

12   parents, who were both from Iran, met at U of A.

13            THE COURT:  Where is your headquarters now?

14            MR. MEHDIZADEGAN:  Arkansas.  I moved my parents

15   actually back to Arkansas from North Carolina about 18

16   months ago when my son was born.  They watch him every

17   day.  They actually live down the street from me.  They

18   were in Iran before that.  I live in Sherwood.

19            THE COURT:  All right.  Thank you.

20            MR. MEHDIZADEGAN:  Thank you, Your Honor.

21            THE COURT:  Again, you're welcome to be seated

22   if you want to.

23            MS. BROYLES:  Thank you.

24        I thought we weren't addressing the private right of

25   action part, so I don't know if I need to go into all of

1    that now or we're still --

2            THE COURT:  No.

3            MS. BROYLES:  We're going to get to that?

4            THE COURT:  We'll probably get there.

5            MS. BROYLES:  Okay.  Okay.

6        If I understood counsel correctly, he said he did not

7    have time to respond to the argument raised in our reply

8    in support of our motion to dismiss the Governor as well

9    as the AG.  He had a week to do that, but nonetheless,

10   that's how long I had to respond to everything else.  But

11   really and truly, my reply just incorporated my original

12   motion to dismiss and the arguments.  So nothing was new.

13   I think it was two pages long, essentially just

14   incorporating those arguments.

15       So I just wanted to clarify that for the record.  I

16   wasn't trying to sneak anything in.  There was nothing new

17   raised in that reply that had not been before plaintiffs'

18   counsel before today.

19           THE COURT:  It's clearify, not clarify.

20   Clearify.

21           MS. BROYLES:  Clearify.

22           THE COURT:  I can tell you're not from Scott

23   county.

24           MS. BROYLES:  No, sir.  I'm from Arkansas, but

25   not from Scott county.

1     Let's see.  He made some general statements that the
2  Governor and the AG control the actions of secretaries and
3  directors of various state agencies.  That is not
4  accurate.  All of them are responsible for following the
5  law.  They are not their quote/unquote boss in that sense.
6  So I don't know -- that wasn't raised as anything in the
7  complaint or in any other argument, but just I wanted to
8  make that known.  They all act in their own individual
9  capacities in accordance with their judgment based on
10  their knowledge, understanding, and things of that sort of
11  law.  They are not the subparts of the Governor or the
12  Attorney General.
13     He made a statement that -- something to the effect
14  of that he was upset or could not believe that the
15  Attorney General or the Governor would say they can't be
16  sued in this case under just the concepts of the American
17  legal institution.  The Eleventh Amendment gives them that
18  authority.  That has been upheld for ages and ages and
19  ages.  There's nothing to say that there should be any
20  negative implication from raising that motion to dismiss.
21  So for what it's worth, state governments, federal
22  government all over preserve and respect that immunity.
23  And that's the basis of their dismissal in addition to the
24  private right of action issues.
25     Again, I don't know at this time whether I need to go

1    into the private right of action.  He made a comment that

2    the -- that a district court in I believe Colorado found

3    that in the *Serna* case that was filed against the Denver

4    Police Department, found a private right of action, and

5    that the Tenth Circuit affirmed that.  That is incorrect,

6    100 percent incorrect.  Both -- or excuse me.

7         The Tenth Circuit specifically found there is no

8    private right of action under the Farm Bill nor a remedy.

9    So I assume that was just a misstatement or maybe a

10   mishearing on my part.  But just for clarification

11   purposes, the Tenth Circuit specifically held no private

12   right of action and dismissed his lawsuit.

13             THE COURT:  What about that, Mr. M?

14             MR. MEHDIZADEGAN:  Thank you, Your Honor.  I did

15   not say that the *Serna* case recognized the private cause

16   of action.  I think we've been clear that you would be the

17   first judge to do that under the Farm Bill.

18        What I did say and what the *Serna* case did say, is

19   that there is rights-creating language in the Farm Bill

20   and that Mr. Serna was of the protected class.  We cite

21   that in our brief.  I can identify it for you in just a

22   moment if I could as to the page number.

23             MS. BROYLES:  The Tenth Circuit did not adopt

24   that in any sense of the word.  He's taking that from a

25   district court opinion that was not upheld on appeal

1  whatsoever.

2          MR. MEHDIZADEGAN:  Your Honor, the order of --

3  the opinion of the Tenth Circuit, Ms. Broyles is correct.

4  The Tenth Circuit didn't address that issue because they

5  didn't need to.  What the Tenth Circuit did is affirm the

6  district court.  The district court found -- and I'll

7  specifically quote it for you.  This is on page 21 of 27

8  of our brief.  I think it was anyway.  I just had my hands

9  on it.  The district court found -- excuse me.  Here it

10  is.

11          This is on page 21 of 27 of the ECF file.  This is in

12  *Serna versus Denver Police Department*.  This is the fourth

13  line from the bottom of the page.  The page number is 15.

14  And the court found, quote, Section 10114 of the Farm Bill

15  identifies hemp producers licensed under subtitle G as a

16  protected class.

17          That was the extent of what I said, Your Honor.  And

18  that finding was not disavowed by the Tenth Circuit or

19  addressed.  The Tenth Circuit didn't need to find it, but

20  as to the first Cort factor, one court has been there and

21  done that.

22          THE COURT:  Thank you.

23          MR. MEHDIZADEGAN:  Thank you.

24          THE COURT:  Yes, ma'am.

25          MS. BROYLES:  If we're coming back to the 1983

```
 1    issue, I'll reserve my argument in that sense.
 2         There were some statements to or about the
 3    implication doctrine and that, essentially, the Court
 4    should imply a waiver of sovereign immunity.  I'm not
 5    aware of a single case under which there is a connection
 6    between the implication doctrine and some imposition of a
 7    waiver of sovereign immunity with respect to -- again, now
 8    I'm getting into my notes when he was talking about 1983,
 9    so I'll come back.
10         I think that covers everything related to the motion
11    to dismiss specifically, but I want to make sure before I
12    sit down if I'll get another chance to come back and talk
13    about private right of action.
14              THE COURT:  Sure.  I'm going to do my dead level
15    best to hear y'all out.
16              MS. BROYLES:  Perfect.  We got all day, so let's
17    do it.  Anything else on the motion to dismiss?
18              MR. MEHDIZADEGAN:  Your Honor, I recognize that
19    this may be a bit unorthodox.  If the Court would allow
20    it, I think you've probably heard enough from me, and I'd
21    like you to hear from the people whose lives are impacted
22    by this law as kind of a precursor to our TRO argument.
23              THE COURT:  Any objection?
24              MS. BROYLES:  I only have an objection as it
25    relates to the expert witness they've brought today.  I
```

1   recognize that the Rule 26 expert reports were set based

2   on the trial date that was set in 2024 on the merits of

3   the matter.  I was not provided any notice about an expert

4   or what their opinions are or what their qualifications

5   are whatsoever were going to be here today.

6              THE COURT:  What about that, Mr. M?

7              MR. MEHDIZADEGAN:  Your Honor, we very recently

8   were able to retain our expert.  He is a prominent expert

9   in the field of hemp production.  And not as an excuse,

10  what we have provided to the Attorney General before the

11  hearing began is a copy of his resume and CV, as well as

12  in our motion seeking permission to bring technology to

13  the courtroom, identified him by name.

14       But I recognize that that is not fair and I don't

15  believe in trial by surprise.  This is not a trial.  I do

16  think for purposes of a TRO, it is essential that there be

17  some understanding of what isomerization and what

18  synthesis means.  Those are the two items that he will

19  testify about.

20       His testimony, if we could make just a very brief

21  proffer, would effectively be that Arkansas' definition of

22  hemp, which is three-tenths of one percent delta-9 content

23  within cannabidiol is like asking how many apples are in

24  an orange.  By the way, the State -- the revision

25  commission, while it did make substantive changes, did not

KRAUSE - DIRECT

1  correct a typographical error in the spelling of

2  cannabidiol, but the State defines the substance of that

3  cannabadiol [sic].   Again, we assume that was a

4  typographical error because that substance does not exist.

5       Mr. Krause would testify as to what that definition

6  means in chemistry speak.   He would testify that as a

7  chemist --

8            THE COURT:   I'm inclined to let him testify.

9  I'll give you plenty of time to respond to that.   We may

10 have to have a later hearing or something.   All right.

11           MR. MEHDIZADEGAN:   Thank you, Your Honor.   We'd

12 like to call Mr. Krause to the stand.

13       (The oath was administered.)

14       MARK KRAUSE, PLAINTIFF WITNESS, DULY SWORN

15                DIRECT EXAMINATION

16 BY MR. MEHDIZADEGAN:

17 Q.   Sometimes I usually need an egg carton to stand on at

18 these podiums or lecterns.

19       Mr. Krause, would you please state your name?

20 A.   Mark Charles Krause.

21 Q.   What do you do for a living, Mr. Krause?

22 A.   I'm a chemist.   I have a bachelor of science in

23 chemistry from Texas Lutheran College, I did graduate

24 studies at the University of Texas, and I have an honorary

25 doctorate from the American Institute of Chemists.

KRAUSE - DIRECT

1          THE COURT:  Which Lutheran school did you go to?

2          THE WITNESS:  Texas Lutheran, sir.

3          THE COURT:  Which synod did they belong to?

4          THE WITNESS:  At the time that they were

5    founded, it was the Lutheran synod, it was the Texas

6    synod.  Now's it's evangelical.  It's ELCM.

7    BY MR. MEHDIZADEGAN:

8    Q.   How long have you been a chemist?

9    A.   45 years.  I've got 35 years owning my own

10   laboratory.  I own a contract testing laboratory.  We test

11   pretty much anything that will walk through the door.

12   Mostly what we do is dedicated to doing FDA import

13   detention, which is we test food that's imported into the

14   United States for contamination.  We also in the last

15   three years -- since 2018, we've been very heavily

16   involved in testing of --

17          THE COURT:  Just a moment.  My Ouija board is

18   stuck.  We'll take a break until about 10 after.  We're in

19   recess.  You can be at ease.

20       (A recess was taken at 2:55 p.m. until 3:17 p.m.)

21          THE COURT:  All right.

22          MR. MEHDIZADEGAN:  Thank you, Your Honor.

23   BY MR. MEHDIZADEGAN:

24   Q.   Mr. Krause, I believe the last question that I had

25   asked you was how long have you been a chemist and what

KRAUSE - DIRECT

1    are you doing these days.  I think you were just starting

2    to talk about what you've been doing since 2018.

3    A.    So in 2018, we began to do a significant amount of

4    analytical work related to hemp and do some contract

5    research that was related to hemp as well.  Really what we

6    do now is it's really a pretty good mix of the food and

7    the hemp.

8    Q.    What is analytical work?

9    A.    We test samples and report results for very specific

10   -- test samples and report results for very specific tests

11   that are asked for.  For example, on the food, we'll test

12   for pesticides or we'll test for metals or we'll test for

13   bacteria.

14   Q.    Do you do similar work in the hemp field?

15   A.    Yes, sir.  In the hemp field, we test for not only

16   potency, but we test for pesticides, solvents, residual

17   metals, any other thing that people might want on their

18   product.

19   Q.    Have you ever lectured about your work in the hemp

20   marketplace?

21   A.    Yes.  Several times.  The last time was last December

22   at a conference called the Hemp Coalition Annual

23   Conference.

24   Q.    I understand that you obviously have no expert report

25   yet.  Prior to your testimony today, what did you review?

KRAUSE - DIRECT

1  A.  So I have reviewed all of the pleadings with the

2  court.  I have reviewed Act 629.

3          MR. MEHDIZADEGAN:  Some housekeeping, Your

4  Honor.  I have what I've marked as Exhibit 1 for this

5  hearing.  It's Mr. Krause's fee schedule and his resume.

6  I've provided a copy to opposing counsel.  May I hand a

7  copy to the witness?

8          THE COURT:  Any objection?

9          MS. BROYLES:  Again, just for the purpose of the

10  record, we just got this right before we started today, so

11  I have not had time to take a deep dive on all of these

12  materials and was not provided any other notice that he

13  would be here today.  Obviously, he's reviewed some

14  materials, so they must have known.

15      But that said, I would just allow for maybe some

16  briefing on the issue an opportunity to provide a counter

17  expert.

18          THE COURT:  I'll allow briefing.  I'm going to

19  note your objection and overrule it and save your

20  exception, but I'll give you briefing time.

21          MS. BROYLES:  Thank you.

22  BY MR. MEHDIZADEGAN:

23  Q.  Mr. Krause, what have I just handed you?

24  A.  This is a copy of my fee schedule and it's a copy of

25  my curriculum vitae as of 2021.

KRAUSE - DIRECT

1   Q.   Did you prepare this document?

2   A.   Yes, sir, I did.

3   Q.   Is it a true and accurate copy of your fee schedule

4   and CV as of 2021?

5   A.   Yes, it is.

6            MR. MEHDIZADEGAN:   Your Honor, we move Exhibit 1

7   be admitted.

8            THE COURT:   Admitted with exceptions noted.

9        (Plaintiffs' Exhibit 1 admitted into evidence.)

10  BY MR. MEHDIZADEGAN:

11  Q.   Mr. Krause, I have what I've marked as Exhibit 2,

12  which is just a copy of Act 629 as it was passed.   Handing

13  a copy of that to you.

14           MR. MEHDIZADEGAN:   Your Honor, I don't know for

15  the purposes of the record whether you would like a copy

16  of Act 629 admitted.   I don't know that that's necessary.

17  We would like it to be part of the record, so we would

18  move -- and lay a foundation.   We would move for its

19  admission.

20           THE COURT:   Well, we can -- I've got a copy of

21  it, so we can admit it.

22       Any objection?

23           MS. BROYLES:   Assuming it's what has been -- or

24  the final version, I assume he's representing that to be

25  accurate.   I don't have any objection to it.

KRAUSE - DIRECT

1     MR. MEHDIZADEGAN:  Thank you.  I have him handed

2 a copy of what I've marked as Exhibit 2 I believe.

3     THE COURT:  Exhibit 2.  It's admitted.

4  (Plaintiff's Exhibit 2 admitted into evidence.)

5     MR. MEHDIZADEGAN:  For the record, this is Act

6 629 as initially passed, not as revised.  The only

7 revisions by the commission were in Section 17.

8 BY MR. MEHDIZADEGAN:

9 Q. And, Mr. Krause, really I want to just direct your

10 attention to page 2 of the exhibit.

11 A. Okay.

12 Q. Arkansas has defined industrial hemp to mean the

13 plant cannabis sativa and any part of the plant, including

14 the seeds of the plant and all derivatives, extracts,

15 cannabinoids, isomers, acids, salts, and salts of isomers

16 whether growing or not with a total delta-9

17 tetrahydrocannabinol concentration no more than

18 three-tenth of one percent of the hemp-derived cannabadiol

19 on a dry weight basis unless specifically controlled in

20 the Uniform Controlled Substances Act; and it cites it.

21  Did I read that correctly?

22 A. Yes, sir.  And the -- there is -- that's how I would

23 pronounce the cannabadiol since that is -- I believe

24 they're referring to cannabidiol.  This is a misspelled

25 compound which doesn't exist.

1  Q.   Is -- cannabidiol is short for what?

2  A.   Cannabidiol is shorten to CBD.  So most people know

3  it as CBD.

4  Q.   Let's just take a big step back.  Where does hemp

5  come from?

6  A.   Hemp comes from the same plant that marijuana comes

7  from.  They both come from a plant called cannabis sativa

8  L.  Many plants produce -- cannabis sativa produces a

9  whole series of compounds called cannabinoids of which CBD

10  and THC are two.  There's currently about 113 cannabinoids

11  known.

12         THE COURT:  Just a minute.  You said they come

13  from a plant known as -- how do you spell that?

14         THE WITNESS:  So cannabis, c-a-n-n-a-b-i-s.

15  Next word s-a-t-i-v-a, and then there is a letter after

16  that that's called L, just capital L.

17         THE COURT:  The second part was the part I was

18  unclear about.

19         THE WITNESS:  Although cannabinoids have been

20  found in various other plants, cannabis sativa produces a

21  much higher concentration of cannabinoids than any other

22  plant that we know of.  So the difference following the

23  2018 USDA bill, the difference between --

24         MS. BROYLES:  Your Honor, can I object?  I don't

25  think there's a question pending at this point.  I think

KRAUSE - DIRECT

1    it was just asked whether to read that.  So if we could

2    get a question in there so I can follow along.

3           THE COURT:  Overruled.  Exception saved.

4    BY MR. MEHDIZADEGAN:

5    Q.   I did ask you a question.  It was to take a big step

6    back and to tell us what the cannabis plant is.  And I

7    think you were in the middle of explaining that.

8    A.   Yes.  So follow the publication of the 2018 Farm

9    Bill, the difference between marijuana and hemp is really

10   the concentration of a very specific cannabinoid, which is

11   delta-9 THC, or delta-9 tetrahydrocannabinols.  And it's

12   the same plant.  So marijuana and hemp are literally the

13   same plant and the distinction is the difference in

14   concentration of that specific cannabinoid.

15   Q.   Which specific cannabinoid?

16   A.   Delta-9 THC.

17   Q.   Is CBD a cannabinoid?

18   A.   Yes.

19   Q.   And delta-9 THC is a cannabinoid?

20   A.   Different compound, but, yes, it's also cannabinoid.

21   Q.   Are these two different molecules?

22   A.   Yes.

23   Q.   So the way Arkansas has described -- has defined hemp

24   -- first of all, are you familiar with the federal

25   definition of hemp?

KRAUSE - DIRECT

1   A.    Yes, I am.   Federally, it's defined as less than --
2   hemp is defined as less than .3 percent of the total
3   delta-9 THC concentration in the dry plant.
4   Q.    And the federal definition has no provision about how
5   much delta-9 THC is in CBD?
6   A.    No, no.
7   Q.    Does that make sense from a chemistry perspective?
8   A.    No.   Actually, it does not.   So the plants produce
9   cannabinoids through various enzymatic processes.   CBD is
10  produced through one enzymatic process.
11  Tetrahydrocannabinol or delta-9 THC is produced through a
12  different enzymatic process.   So to try to relate the
13  concentration of delta-9 THC to the amount of CBD that the
14  plant produces makes no sense at all.
15  Q.    When I said earlier that it's like asking how many
16  oranges are in an apple, is that fair?
17  A.    That's fair.   Or asking how many Ford pickups are in
18  your Toyota, something of that nature.
19  Q.    Two different molecules that don't exist in one
20  other?
21  A.    Two different molecules that are not the same thing.
22  Q.    How does delta-8 THC come to exist?
23  A.    Delta-8 THC is another one of the natural-occurring
24  cannabinoids.   It's in the plant.   It's in the plants at a
25  lower concentration than delta-9 THC, but it is definitely

KRAUSE - DIRECT

1   present in all of the plants.  It's, again, formed by

2   enzymatic processes that are not the same as the delta-9

3   process nor the same as the CBD process.  These are

4   independent pathways, independent processes.

5   Q.    Try to explain it to someone who disappointed their

6   father and did not become a scientist, instead became a

7   lawyer.  From the field when the hemp plant is grown, it's

8   harvested.  What happens next?

9   A.    Typically, after harvest, the plant is dried in a

10  drying facility.  At that -- unfortunately or fortunately,

11  however you want to look at it, those enzymatic processes

12  do not come to a complete stop when the plant is harvested

13  and there are other processes that are known as abiotic --

14  I'm sorry.  I'm going to spell that.  A-b-i-o-t-i-c.

15  Abiotic meaning nonbiological processes that continue to

16  cause changes in the concentrations between CBD and THC.

17        For example, CBD that's exposed to sunlight will

18  slowly isomerize to THC.  This means that, again, given

19  the definition where we have a definition of the plant in

20  terms of THC as a function of the concentration of CBD,

21  your concentrations are going to be changing post harvest.

22  Q.    I think you said isomerization.  What is that?

23  A.    Isomerization is a rearrangement of chemical bonds

24  within a molecule.  Isomers are compounds that have the

25  same molecular weight, they have the same molecular

KRAUSE - DIRECT

1   formula.   So in this case, it's $C_{21}H_{30}O_2$.   Those are all

2   letters.   And so CBD and THC have the same molecular

3   weight, but they have bonds in different places.

4         So one of the things that occurs in nature is the CBD

5   is relatively unstable as compared to THC.   So with energy

6   input -- let's talk about sunlight.   So we get sunlight

7   which has photons which give us energy to move bonds.   As

8   those bonds begin to move, they want to go to a more

9   stable configuration.

10        So CBD will isomerize, will change into THC.   This is

11   a naturally occurring -- and, actually, you can't stop it.

12   It's a naturally-occurring process and you can't do

13   anything to stop it.

14   Q.   When isomerization occurs, can CBD become delta-8 THC

15   without any chemical laboratory involvement?

16   A.   Oh, yes, absolutely.

17   Q.   Sunlight?

18   A.   Sunlight, heat, combination of both.

19   Q.   What does the word "synthetic" mean in the chemistry

20   world?

21   A.   It implies a specific kind of reaction.   So the

22   definition of "synthesis" in chemistry is two or more

23   molecules that react together to form a new molecule or

24   molecules.

25   Q.   Is hemp a synthetic substance?

KRAUSE - DIRECT

1  A.   No.   Absolutely not.

2  Q.   Is CBD a synthetic substance?

3  A.   No.   Naturally occurring.

4  Q.   Is delta-8 THC?  I'm not talking about delta-8 THC-O,

5  which is delta-8 THC acetate ester.   That's a different

6  thing.

7       Is delta-8 THC a naturally-occurring substance?

8  A.   Yes.   It's considered to be a phytocannabinoid,

9  meaning it's considered --

10 Q.   Turn to the third page of Act 629 in front of you.

11 Section 6 of the Act amends the criminal code to identify

12 a number of these molecules that you've identified as

13 being naturally occurring in the plant.

14 A.   Yes.

15 Q.   And it identifies them as synthetic substances in a

16 particular delta-6 cis, c-i-s, or trans, t-r-a-n-s, THCs

17 otherwise known as delta-8 cis or trans THC.

18      From a chemistry perspective, does it make sense to

19 refer to delta-8 THC as a synthetic?

20 A.   No.   When we're referring to synthetic cannabinoids

21 in the DEA Controlled Substances Act, we're referring to a

22 series of compounds that chemically are known as JWH

23 compounds.   These were developed by a fine gentleman and

24 chemist by the name of John Huffman.

25      These are naphthol indoles.   They are a completely

KRAUSE - DIRECT

1    different structure.  The reason that he chose the

2    terminology synthetic cannabinoids is that they acted on

3    the CB-1 and CB-2 receptors in human bodies in a manner

4    similar to how THC reacts in your body.

5    Q.    But these are JWH compounds, not THC?

6    A.    Those are JWH compounds, not THC.

7    Q.    What's the street name for synthetic cannabinoids?

8    A.    K2 or spice.  Sometimes they're called bath salts.

9    Q.    Those are things that are made in a lab, right?

10   A.    Absolutely.  Those are synthetic.

11   Q.    In the work that you do, are you making bath salts

12   and K2 and spice?

13   A.    No.  We have analyzed them, but we do not make them.

14   Q.    Are you able in the lab to differentiate

15   manufacturing processes?

16   A.    For something like a JWH, certainly.  We know that

17   that's a synthetic process.

18   Q.    That's already banned.

19   A.    That's banned.  That's completely banned.  But when

20   you're talking about phyto -- for example, we're talking

21   about phytocannabinoids.  So when you're talking about

22   phytochemicals, no.  The problem is that the synthetic

23   version of delta-9 THC is analytically the same as the

24   naturally-occurring version of delta-9 THC.  We can't

25   distinguish between a synthetically-made delta-9, which

KRAUSE - DIRECT

1  there are reactions for.

2      For example, FDA has an approved drug called

3  dronabinol.  Dronabinol is delta-9 THC, but it's synthetic

4  because you can't get enough purity out of the plant to

5  meet the FDA standards for a drug.

6      But we cannot distinguish analytically between those

7  two.

8  Q.   Mr. Morgan, for instance, before Act 629 took effect,

9  grew and harvested hemp plants that he was able to create

10  into CBD tinctures that were of 3300 milligrams.

11      Is that a naturally-occurring substance?

12  A.   Yes.   Absolutely.

13  Q.   Would you be able to differentiate in a lab between

14  whether Mr. Morgan created his tincture through a chemical

15  process or through a natural process?

16  A.   No.   I would not.

17  Q.   Finally, turn to the next page.  In addition to

18  listing specific molecules in the criminal code, Arkansas

19  further and identified products derived from industrial

20  hemp that were produced as a result of the synthetic

21  chemical process converting industrial hemp or a substance

22  contained in the industrial hemp into delta-8, delta-9, et

23  cetera.

24      What I've just described, the CBD tincture that

25  Mr. Morgan had, is that something that's synthetically

KRAUSE - DIRECT

1    processed?

2    A.    No.    Again, the definition of isomerization makes it

3    a nonsynthetic process.    It's a naturally-occurring

4    process, but it is definitely not a synthesis.

5         So this paragraph describes synthetically-derived,

6    which in chemistry terms would mean that you start with

7    materials -- two materials, you use a catalyst or

8    something similar to that to create this delta-8 or the

9    delta-9 or the delta-6a10a.    This would not be coming out

10   of hemp.    Hemp would be naturally derived.

11   Q.    My final question and the next section or subsection

12   rather identifies as a criminal substance any psychoactive

13   substance derived there from.

14        Is CBD a psychoactive substance?

15   A.    Oh, yeah.    Absolutely.

16   Q.    Is caffeine a psychoactive substance?

17   A.    Sure.

18   Q.    Sugar?

19   A.    Especially in four-year-olds, yes.

20   Q.    What effect does defining allowable THC in terms of

21   the amount of CBD present have on industrial hemp

22   production?

23   A.    It's huge.    It actually literally makes it

24   impossible.    So the methods that are currently used to

25   measure the THC concentration in plants have an effective

KRAUSE - DIRECT

1  detection limit of about .1 percent of the plant weight.

2  So when we talk about defining -- changing the definition

3  as Arkansas' done where they're saying, we're going to

4  redefine that.  We're going to take hemp as .3 percent of

5  the cannabidiol.  The cannabidiol in plants that are

6  formed for cannabidiol, for CBD, ranges, let's say, 6 to

7  14 or 15 percent.  So all is an average of ten percent.

8       So we've already said, okay, we're going to look for

9  .3 percent.  We're not looking for .3 percent anymore.

10 Now we're looking for .03 percent.  We're trying to use a

11 method that has a detection limit of .4 percent.

12      So with the method when we even get to -- and the

13 allowable four plants that are raised for cannabidiol,

14 industrial hemp is worse.  So industrial hemp is grown in

15 such a manner and using specific seeds that you keep the

16 CBD concentrations down low, typically about one percent.

17      So now, we're not talking about looking for .03

18 percent THC.  We're looking at .003 percent THC.  And

19 there's no method that will allow to you do that, so

20 there's no way that industrial hemp could be tested to

21 meet the criteria that's present in section 2.

22 Q.    Handing you what I've marked as Exhibit 3.

23      MR. MEHDIZADEGAN:  I will represent, Your Honor,

24 Exhibit 3 is attached to our amended complaint and in our

25 filings within the record.

KRAUSE - DIRECT

1    BY MR. MEHDIZADEGAN:

2    Q.   Mr. Krause, have you seen this before?

3    A.   Yes, sir, I have.

4              MS. BROYLES:  I'm sorry.  What --

5              MR. MEHDIZADEGAN:  It is a document I handed you

6    later.  It's under your stack of papers right there.

7              MS. BROYLES:  I didn't have my --

8              THE COURT:  Any objection?

9              MS. BROYLES:  No, sir.

10             THE COURT:  Admitted.

11        (Plaintiff's Exhibit 3 admitted into evidence.)

12   BY MR. MEHDIZADEGAN:

13   Q.   Mr. Krause, will you please read just the first

14   paragraph?

15   A.   Products that were produced by a synthetic chemical

16   process that converted hemp into delta-8, delta-9,

17   delta-6a10a, delta-10 THC, or any other psychoactive

18   substance derived therein have been added to the Arkansas

19   Controlled Substances list, including delta-8 THC -- THC

20   acetate ester, delta-9 THC acetate ester -- delta-9 THC

21   acetate, delta-6a THC acetate, and delta 10a THC acetate.

22   Q.   This document is produced by the Arkansas Tobacco

23   Control Center, correct?

24   A.   That's what it says, yes, sir.

25   Q.   Is this a correct understanding from hemp perspective

KRAUSE - DIRECT

1  to what -- as to whether delta-8 is a synthetic substance?

2  A.   Well, it's -- so my reading of this would be that

3  they are controlling delta-8 that has been produced

4  synthetically.   Now, there's some problems in that they go

5  on to name delta-6a acetate and delta-10a acetate, and

6  those two compounds don't actually exist.

7       But, yes, I believe -- again, the conversion I'm not

8  sure that there's a synthetic chemical process that

9  converts hemp into delta-8.   There are synthetic chemical

10 processes to produce delta-8, but not necessarily to

11 convert hemp into it.

12 Q.   I would like to show you what is attached as Exhibit

13 1 to docket 3 or docket 3-1.   I think it's 3-1.   It's

14 attached to the State's motion to dismiss.   It's a

15 PowerPoint presentation produced by Arkansas.

16      Did you have an opportunity to review that when you

17 were reviewing the pleadings?

18 A.   Yes, briefly.

19 Q.   On page 19 of 78 of that, which I'm handing to you --

20      I'm not going to ask this be made an exhibit, Your

21 Honor.

22      There is a section about how the FDA -- or rather how

23 federal government deals with hemp.

24      Would you please read that for the Court?

25 A.   The last paragraph?

KRAUSE - DIRECT

1    Q.    Yes.

2    A.    Federal hemp rules require all state hemp production

3    plants to have a testing protocol to measure delta-9 THC

4    -- I'm going to spell this.  This is decarboxylation,

5    d-e-c-a-r-b-o-x-y-l-a-t-i-o-n.  That's total THC.

6    Arkansas' hemp program has analyzed compliant samples

7    using total THC percentage since the first year of the

8    research program in 2019.

9    Q.    Is it correct that the federal Farm Bill's regulation

10   hemp measures delta-9 THC based on total THC?

11   A.    No, it is not.  They measure delta-9 THC

12   post-decarboxylation, but they are measuring total delta-9

13   THC, not total THC.

14   Q.    But even if it's total THC, that's not the same thing

15   as total THC within cannabidiol.  Is that right?

16   A.    Okay.  No.  Yes, you're right.  No, it's not the same

17   thing.

18   Q.    So Arkansas recognized the Farm Bill required total

19   THC, not a percentage within CBD?

20   A.    Yes.  Well, the Farm Bill does not require total THC.

21   The Farm Bill requires total delta-9 THC, which is

22   completely different than total THC.

23       And, yes, you're right, they recognize that it's

24   total THC within the plant and not within -- not that

25   contained within the fraction that is CBD.

KRAUSE - DIRECT

1  Q.   As a laboratory, are you required to hold a license
2  in order to test these products?
3  A.   No.   The State of Texas requires that you have iso
4  accreditation to report data to the agriculture program,
5  but there are no licenses specific to this kind of
6  testing.
7  Q.   To your knowledge, does every state require a license
8  for hemp production?
9  A.   They're all different.   I can't really answer to all
10  50, so I'm not sure.
11  Q.   That's fair.
12       I'm handing you page 47 of that same exhibit.   There
13  is language in red on the State's PowerPoint.   Would you
14  please read that for the Court?
15  A.   Federal law requires all delta-9 THC concentrations
16  be measured using post-decarboxylation.   In parentheses,
17  result is commonly referred to as total THC, close
18  parenthesis.
19  Q.   Handing you page 53 of that same exhibit.   Would you
20  please read that to the Court?
21  A.   The entire?
22       Measurement of THC concentrations can be conducted
23  with many different laboratory method analysis.   The
24  combined, or decarboxylated THC, is often referred to as
25  total THC.   Federal law requires testing for total THC.

KRAUSE - DIRECT

1    This has been the method used by the department since the

2    first year of the research program in 2019.

3    Q.   Is that how Arkansas is defining -- based on your

4    understanding of chemistry, is that now -- is that the

5    same as what Arkansas is doing today with its definition

6    of hemp being the percent of delta-9 THC within the CBD

7    molecule?

8    A.   No, it is not.  They are -- they are analyzing for

9    decarboxylated delta-9 THC, so that would include delta-9

10   THC and delta-9 THC acid, and then they are ratio-ing that

11   to the amount of CBD that is present in the plant and

12   calculating the results that way.

13   Q.   My last question, Mr. Krause.  Are THCs synthetic

14   cannabinoids?

15   A.   No, sir, they're not.

16         MR. MEHDIZADEGAN:  Thank you, Your Honor.

17   Again, we wanted to limit our testimony in respect to the

18   State's position.

19         THE COURT:  Okay.

20         MS. BROYLES:  I'm just going to sit here so I

21   don't have to dance around.  Just for the purpose of the

22   record, Your Honor, I do want to preserve my objection so

23   that any questions I ask, don't -- I don't intend to waive

24   anything.

25         THE COURT:  Your request is granted.

KRAUSE - CROSS

```
 1            MS. BROYLES:  Thank you so -- thank you so much.
 2            THE COURT:  You don't need to thank me.  I make
 3   ruling gratuitously.
 4                     CROSS-EXAMINATION
 5   BY MS. BROYLES:
 6   Q.   Mr. Krause?
 7   A.   Krause.  Yes, ma'am.
 8   Q.   Krause.
 9   A.   Krause.
10   Q.   Krause.  Okay.  Sorry.  I didn't catch that the E on
11   the end.
12        When were you first contacted about this case?
13   A.   Last week.
14   Q.   What day last week?
15   A.   Now you're asking a hard question.  Probably
16   Wednesday.
17   Q.   Have you ever worked with plaintiffs' counsel before
18   or any of the plaintiffs with respect to their companies,
19   things of that sort?
20   A.   I have not worked with counsel previously.  I have
21   worked with Hometown Hero in the past.
22   Q.   In what capacity?
23   A.   Done some consulting for them on the wide variety of
24   topics.
25   Q.   Like what?
```

KRAUSE - CROSS

1    A.    I did some laboratory audits for some of their

2    producers.  I've done some regulatory consulting to them.

3    I've done some contract consulting to them.

4    Q.    Do you have an open contract with them at this time?

5    A.    No, ma'am, I do not.

6    Q.    You are from or at least live in Austin, Texas.

7    A.    Not from there, but live there, yes, ma'am.

8    Q.    When did you arrange for travel to be here today?

9    A.    I believe today is Wednesday.  I believe I set up my

10   travel arrangements Monday.  It was either Sunday or

11   Monday.

12   Q.    When were you -- so it sounds like you were retained

13   last week.

14   A.    Yes.

15   Q.    Did you say Wednesday?

16   A.    I think it was mid week.  So let's call it Wednesday

17   or Thursday.

18   Q.    Were you provided all the pleadings and materials

19   that you reviewed then at that time?

20   A.    Yes, ma'am.  Since then, yes.

21   Q.    As far as the opinions that you shared with us today,

22   are those things that you shared or articulated in your

23   discussions with counsel at least as of last Wednesday?

24   A.    No.  I --

25              MR. MEHDIZADEGAN:  Your Honor, I'm going to

KRAUSE - CROSS

1    object to this line of questioning as wildly irrelevant

2    for the purpose of this TRO hearing.

3              THE COURT:  Wouldn't that get into

4    attorney-client?

5              MS. BROYLES:  No, Your Honor.  He's not -- he's

6    an expert witness.  He's not a client of counsel.

7              MR. MEHDIZADEGAN:  Your Honor, we would assert

8    the consulting expert privilege at any moment prior to his

9    testimony today.  I think the consultancy he provided me

10   is aiding and assisting in my ability to represent these

11   plaintiffs.  We assert privilege.

12             THE COURT:  What are you getting at here?

13             MS. BROYLES:  For the purpose of the record, I

14   was curious as to when they knew he would be coming today

15   and what he would be saying, but I'll continue on.  Just,

16   again, it depends on the case --

17             THE COURT:  Okay.  Continue on.  That's the same

18   thing as continuing I think.

19   BY MS. BROYLES:

20   Q.   Have you ever drafted legislation?

21   A.   No, ma'am.

22   Q.   Were you involved in any respect in -- well, let me

23   back up.

24        Texas bans delta-8, true?

25   A.   It's on the controlled substances list, yes.

KRAUSE - CROSS

1  Q.    Were you a part of any of that regulatory process or

2  review?

3  A.    As far as the regulatory process itself, no, I was

4  not.

5  Q.    And again, you've never done that for a state before?

6  A.    No.

7  Q.    You've never been retained by a state for the purpose

8  of drafting regulation for CBD or marijuana?

9  A.    No, ma'am.

10  Q.    Would you agree as well that there are -- I think you

11  said earlier -- I don't know what the number of states are

12  now, but there are at least over ten, many more

13  potentially, that -- states that find that delta-8 is

14  banned.

15  A.    I don't know the number either.  I do know that most

16  of those are what we call recreational states, but, yes,

17  there are -- I think it's over ten.  But I'm with you, I

18  don't know the number.

19  Q.    When you say "recreational states," do you mean

20  recreational marijuana?

21  A.    Yes, ma'am.

22  Q.    So even though they may allow recreational marijuana,

23  they ban delta-8 THC?

24  A.    Yes.  That's my understanding.

25  Q.    Is that also true for delta-10?

KRAUSE - CROSS

1   A.    I don't know about delta-10.

2   Q.    Are you familiar with the Cannabis Regulators

3   Association?

4   A.    No, I'm not.

5   Q.    Do you keep up with any of the -- any of Congress'

6   outreach to such associations then regarding clarification

7   on laws and recommendations for additional CBD laws?

8   A.    I peripherally do in that I deal with a couple of

9   lawyers who dedicate themselves to cannabis work and they

10  occasionally ask my opinion on chemistry issues with

11  those, yes.

12  Q.    So would it be fair to say that in some capacity you

13  may have been provided correspondence from Congress to

14  various associations regarding the regulation of --

15          MR. MEHDIZADEGAN:   Your Honor, I'm going to

16  object to lack of foundation for that leap.

17          THE COURT:   Overruled.   Exception saved.

18  BY MS. BROYLES:

19  Q.    If we were in a deposition, I'd ask you to read that

20  back, but I won't do that.

21          In any event, would it be fair to say that you review

22  association materials with respect to opinions that they

23  may give to Congress when requested?

24  A.    Occasionally, yes, ma'am.

25          MS. BROYLES:   May I approach the witness, Your

KRAUSE - CROSS

1   Honor?

2          THE COURT:  Sure.

3          MR. MEHDIZADEGAN:  Your Honor, may I have a copy

4   of what she's showing the witness?

5          THE COURT:  That'd be a good idea.

6      Y'all can approach the witness when you want to

7   without permission.

8          MS. BROYLES:  Would the Court like a copy as

9   well?

10         THE COURT:  Yes.

11         MS. BROYLES:  I've got two.

12  BY MS. BROYLES:

13  Q.   Have you seen that letter or the responding Cannabis

14  Regulators Association opinion dated August 18, 2023?

15  A.   No, ma'am.  I have not seen this.

16  Q.   Within it, it talks about, essentially, the various

17  issues as it relates to delta-8, delta-10, and delta-9,

18  and particularly in the food market.

19      Are you kind of familiar with those concerns?

20  A.   In the food market?

21  Q.   Yes.

22  A.   Yes, ma'am.

23  Q.   What are those concerns?

24  A.   Well, none of the cannabinoids are considered to be

25  what is called generally recognized as safe.  It's an FDA

KRAUSE - CROSS

1   definition for -- or designation I should say for

2   compounds that can be added to food without specific

3   permission from FDA.  And so my understanding is that none

4   of these can be added to a food product.

5   Q.   Would you agree with me that that does in fact

6   happen?

7              MR. MEHDIZADEGAN:  Objection, Your Honor, to the

8   -- again, the lack of foundation here.  I think she's

9   asking that question in the abstract.  This witness will

10  be answering.  He's testified that he doesn't have the

11  foundation to answer it.

12             THE COURT:  Overruled.  Exception saved.

13             THE WITNESS:  Can you repeat that?  I'm sorry.

14  BY MS. BROYLES:

15  Q.   Would you agree that those -- the concerns are real

16  as it relates to these materials being included in food

17  products and that they are included in certain food

18  products?

19  A.   Well, the definition of the parts that they're added

20  to, I'm not sure necessarily includes food because FDA

21  precludes you from adding any of these products to a food

22  product.

23  Q.   You're right.  Sorry.  I've gotten confused.

24       There are certain consumables that more or less

25  appear to be food, like ice creams, things of that sort.

KRAUSE - CROSS

1  A.   Yes.

2  Q.   And you understand that there is a large -- a

3  considerable, significant movement in the country right

4  now to protect against those products being -- landing in

5  the hands of children and those who may not understand the

6  difference between CBD, THC, et cetera?

7  A.   Absolutely.

8  Q.   Can you tell me about that, please?

9  A.   The -- I think most of the states that I'm familiar

10 with that I've dealt with are moving toward limiting the

11 access of cannabinoids to people over the age of 21.

12 Q.   And that's true in Texas where you're from.

13 A.   It's not, unfortunately.  It probably should be, but

14 it's not.

15 Q.   I understand.  Is it true in Colorado?

16 A.   I don't know.

17        MS. BROYLES:  Your Honor, for -- may I move to

18 have this material marked as Exhibit A to -- Defendant's

19 Exhibit A?

20        MR. MEHDIZADEGAN:  We would object, Your Honor.

21 He said he's not seen it.  There's no foundation for it.

22 And I believe in my very short reading, it's talking about

23 respective legislation that has nothing to do with this

24 lawsuit.

25        THE COURT:  Tell you what I'm going to do.  I'm

KRAUSE - CROSS

1  going to overrule your objection, but I'm going to save

2  your exception.  Admitted.

3      (Defendant's Exhibit A admitted into evidence.)

4          MS. BROYLES:  Thank you, Your Honor.

5          THE COURT:  Make sure it gets marked.

6  BY MS. BROYLES:

7  Q.   That means delta, but also defendant.

8  A.   Okay.  I know the delta.  By the way, counselor, that

9  means he.

10  Q.   A lot of things.

11      Were you aware in your preparation for today that the

12  2018 Farm Bill allows for states to pass more stringent

13  regulations as it relates to hemp products?

14          MR. MEHDIZADEGAN:  Your Honor, objection.  I

15  think she's asking for a legal conclusion.  I think that's

16  your job and not his.

17          THE COURT:  Overruled.  Exception saved.

18  BY MS. BROYLES:

19  Q.   Is that your -- as a chemist, have you seen that in

20  practice, that certain states have regulations that vary

21  as far as their definitions of hemp as compared to the

22  2018 Farm Bill?

23  A.   I've not seen the definitions of hemp that vary, but

24  I do agree that the states are allowed to be more

25  restrictive.

KRAUSE - CROSS

1   Q.   Thank you.

2        Did you review the USDA final plan as it relates to

3   the 2018 Farm Bill in preparation for your testimony

4   today?

5   A.   No, ma'am.

6   Q.   Are you familiar with it?

7   A.   Roughly, yes.

8   Q.   I don't have a copy, but --

9   A.   We're equal then.

10  Q.   I can give you the laptop, but I don't -- but we'll

11  get there if we need to.

12       Taken from USDA final plan, it says Section

13  297(b)(a)(2)(A)(ii) of the AMA [sic] requires that state

14  and tribal plans for primary regulatory jurisdiction

15  include procedure for testing, using post-decarboxylation

16  or other similarly-reliable methods delta-9 THC

17  concentration levels of hemp produced in a state or

18  territory or Indian tribe.

19       Did that sound correct to you?

20  A.   Okay.  Yes.

21  Q.   Since not all testing methods include

22  decarboxylation, AMS is required -- do you know what AMS

23  stands for?

24  A.   No.

25  Q.   -- that the total THC, which includes the potential

KRAUSE - CROSS

1   conversion of tetrahydrocannabinolic acid, which is THC-A,

2   into THC be reported and used for purposes of determining

3   the THC content of a hemp sample.

4       Is that --

5   A.    That is correct.  And that is the USDA method for

6   performing that analysis, yes.

7   Q.    AMS looked at current testing methodologies that

8   would meet the decarboxylation requirement set in the 2018

9   Farm Bill and gas chromatography, GC testing, be applied

10  to the sample which -- applied to a sample which

11  decarboxylates THC-A producing delta-9 THC so that the

12  final delta-9 THC result is actually a total THC result.

13  A.    And I believe USDA in previous definitions defines

14  the term "total THC" as total delta-9 THC, yes.

15  Q.    But total THC result is what the -- the final

16  testing.

17  A.    If you do the decarboxylation, what you end up with

18  is total of everything that can form delta-9 THC.  So if I

19  can give a small explanation.

20      The reason that you do that is that, when you burn --

21  so we're talking about smoking.  When you burn the plant

22  material, the temperature at which the plant material

23  ignites and burns like in a cigarette actually causes the

24  conversion of THC-A into THC.  So you don't get just a

25  delta-9 THC concentration, you get the sum of the delta-9

KRAUSE - CROSS

1    and the THC-A, which is why USDA chose to use the

2    post-decarboxylation procedure.

3    Q.   Because that's the -- the heating of it makes it

4    stronger.

5    A.   You get more THC, yes, ma'am.

6    Q.   So it is a stronger final product.

7    A.   Yes.

8    Q.   And that's really what the protection is with respect

9    to delta-8, -9, and delta-10 is, after they're heated,

10   they're much stronger THC levels.

11   A.   No.  So the heating -- the heating -- so there's two

12   forms in the plant.  One form is what we call delta-9 THC.

13   The other one is delta-9 THC acid.

14        So when you heat it, there is a small piece of that

15   molecule that cleaves off and causes the acid form to

16   become the THC form.  So if you don't -- that cleaves

17   under heat.  That acid goes away and the heat forms

18   delta-9 TH -- exclusively delta-9 THC.  If you don't do

19   the decarboxylation, you under-represent the amount

20   of delta-9.

21   Q.   The purpose of total THC is to ensure that you

22   actually account for the THC in the product, not just the

23   limitation to delta-9 THC?

24   A.   No.  It's limited to delta-9 because you're only

25   using delta-9 THC and delta-9 THC-A.  You're adding those

1   two components together.

2   Q.   I guess it ensures that you measure against the .3

3   percent.

4   A.   Yes.   That gets measured against the .3 percent.

5             MS. BROYLES:   I think that's all the questions I

6   have.   Thank you.

7             MR. MEHDIZADEGAN:   Nothing further for Mr.

8   Krause, Your Honor.

9             THE COURT:   May this witness stand down?

10             THE WITNESS:   Thank you, Your Honor.

11             MR. MEHDIZADEGAN:   Your Honor, I promise to move

12   this along a little quicker, although this next witness

13   might take a little longer and I think it's appropriate.

14             THE COURT:   Before we do that, I want to ask

15   y'all a question I want y'all to address.   I've asked it

16   before, but it's -- if you've answered it, it's gone over

17   my head.   I'm going to read it.

18       Do plaintiffs need a private right of action under

19   the Farm Bill for an expressed preemption claim?   That was

20   not an issue in the *Dines* case.

21       I'll go first with the State.

22             MR. MEHDIZADEGAN:   Your Honor, I'm sorry.   Were

23   you asking the State to go first?   I just didn't hear it

24   correctly.

25             THE COURT:   Beg pardon?

1          MR. MEHDIZADEGAN:  Did you ask the State to go
2  first?  I didn't hear it correctly.
3          THE COURT:  Yes.
4          MS. BROYLES:  I've shuffled papers so I've got
5  to get all my notes on it.
6          THE COURT:  All right.  I want you to have all
7  of your ammunition.
8          MS. BROYLES:  Maybe this is a dramatic pause.
9      So the question we've got is -- and I know we've
10  already briefed the private right of action with respect
11  to the other aspects, but do plaintiffs need a private
12  right of action under the Farm Bill to proceed on an
13  expressed preemption claim that was not covered in the
14  *Dines* case.
15      So this issue is covered -- I'm sorry.  Can you hear
16  me?
17          THE COURT:  Yeah.  I'm just concentrating.
18          MS. BROYLES:  Thank you.  In the *Duke's*
19  *Investment* case, which is a 2023 case -- well, there's one
20  in 2022 and then furthermore in 2023, but I'll give you
21  the cite.  2022 WL 17128976.  And this is out of Hawaii.
22      And in particular in that case, it was very similar
23  case as is before the Court today.  The plaintiffs alleged
24  that the definition that Hawaii adopted as it relates to
25  hemp products was unconstitutional because it was

1   preempted by federal law.  And the court in that case

2   specifically held that the 2018 Farm Bill allowed for

3   states to -- to create more stringent laws with respect to

4   their regulation of hemp.  So the court in that case

5   specifically found that there was no issue with the

6   definition of hemp.  And then furthermore, it went on to

7   discuss somewhat -- and there was some standing arguments

8   and things as it related to that matter, but on the

9   preemption case it -- I wish it went into a little more

10  further detail, but I think the main issue, it still has

11  to get back to the fact that, in order for this court to

12  have jurisdiction, there still has to be rights created

13  and you can't really get to the expressed preemption claim

14  per se without still addressing the fact that

15  jurisdictional requirements alone or the 1983 alone,

16  things of that sort, still have to create -- there still

17  has to be a right-creating language as well as a right or

18  -- excuse me -- a remedy that exists.

19       Under the Farm Bill neither of those exist even with

20  respect to the determination on the -- on the matter --

21  excuse me.  Sorry. I should go back.

22       In the *Serna* case actually that we talked about

23  earlier, the Tenth Circuit case, that was the one where

24  the Denver State Police took some product that had been

25  brought to the airport.  And in that case, his primary

1    argument was as it related to interstate commerce.  He

2    specifically argued the ten -- 10144 section and said

3    that, because it was legal federally, that any sort of

4    taking of his product was banned by interstate commerce or

5    what have you.

6         Even in that case, the court said there was no

7    private right of action going expressly to -- to the

8    expressed language of the Farm Bill as well as under

9    implied right of action.  So this issue as it relates to

10   the underlying express preemption claim has already really

11   been analyzed in that respect.

12            THE COURT:  Thank you.

13            MS. BROYLES:  Does that answer?

14            THE COURT:  Thank you.

15        Mr. M.

16            MR. MEHDIZADEGAN:  Your Honor, I like the M

17   designation.  It reminds me of James Bond.  I might try to

18   adopt that in my personal life, but my wife would probably

19   think that's not funny.  I do.

20        Let me address the *Serna* case first.  Mr. Serna was a

21   pro se litigant.  He did not assert every claim that we've

22   asserted here.  I've read every filing in the *Serna* case.

23   He was pro se.  And part of that lawsuit addressed his

24   ability -- part of the district court decision denied him

25   the ability to amend a complaint, to assert new causes of

action, new claims.  His claims were primarily based only on interstate commerce.

We go much farther.  We describe and address the regulatory taking, the issues with the commerce clause, and the void for vagueness argument in and of itself. That is not an answer to your question, but I think it's an important feature of that decision to understand.

Second point that I would take is to distinguish *Duke's Investment* case.  I promise I will directly answer your question, but there are two things I want to do first.

The case cited by the State was a magistrate's order. The actual decision was adopted by the district court rather.  Excuse me.  No means to denigrate the magistrate. It's actually 23 WL 3166729.  I'm not sure if that's what I heard.  April 28, 2023, order.

The court in that case -- the first problem with the plaintiff's procedural due process claim is that the plaintiff alleges a past violation of state law, not an ongoing federal violation, which is what we assert here.

The court in that case also went further -- and this leads into my discussion of your question -- and said, as stated above, *Ex parte Young* does not apply to a suit alleging a past violation nor does it apply.  The plaintiff alleges that a state official violated state

1    law.

2         Here and in that case, *Ex parte Young* applies because

3    there was a violation of federal law -- excuse me.  The

4    section I recited is page 8.  Here in this case there was

5    a violation of federal law.  It remains ongoing.  It's

6    happening to this day.  That's the difference.  So that's

7    why, again, I think we are in *Ex parte Young* -- *Ex parte*

8    *Young* territory.

9         Under that ruling, there was an exception to the 11th

10   Amendment immunity for private individuals suing state

11   officials, just as we're doing here.

12        As it relates to whether we need a private right of

13   action under the Farm Bill to proceed on an expressed

14   preemption claim, we don't see that as being either

15   addressed in *Dines* or required in the 1983 jurisprudence

16   that we have seen here, if your question -- if the

17   question of the Court is directly related to 1983

18   specifically.

19        But again, Your Honor, I would just like to point out

20   *Serna* had his property seized.  He wanted money.  We don't

21   want money.  So there are not really good 1983 cases that

22   deal with the remedy here.  1983 certainly entertains and

23   expects the broad range of federal remedies available,

24   including injunctive relief, but most of the cases that

25   cite 1983 intersect with the monetary claim issue in the

1    11th Amendment.  We don't have that here.

2        So I think your decision on that specific issue will

3    be a unique one that stands out, not one that requires you

4    to sow new ground, but one that just requires you to

5    recognize again what's been recognized by that flag for

6    three centuries:  That private official -- private

7    individuals can sue the state governments that tend to

8    ignore federal law.

9        Arkansas has a specific and muddied history on that

10   particular issue.  It should be well known to this state

11   that they're not allowed to do this.  There is a history

12   of abortion law.  Every decision that's related to that

13   prior to McDuff (phonetic) has addressed the federal

14   court's ability to enjoin illegal state action -- ongoing

15   illegal state action that violates federal law.

16       Do we need a private cause of action in the Farm Bill

17   to proceed on an expressed preemption claim?  According to

18   our research, Your Honor, the answer to that question is

19   no.  I think it's -- if that were the case, *Ex parte Young*

20   would have had to have been decided otherwise contrary

21   because 1983 didn't exist at that time.  So, no -- and

22   there was no expressed preemption.  So, no, I don't think

23   we would need that.  I don't think anything in the court's

24   more contemporaneous jurisprudence changes that analysis

25   at all.  Again, I think it's just so foundational to

1   American democracy.

2        And I do find it personally offensive.  I do.  I

3   think the idea that -- the idea that the state can pass a

4   law that that it knows violates federal law, which, again,

5   the acting knowledge in itself, the idea that the state

6   can do that and no one can hold them accountable is

7   offensive.

8        The General Assembly expected to be sued here.  And,

9   again, we're asking just for that specific relief.  I

10  think we're allowed to proceed.

11       I also think the Court can pick up where the *Serna*

12  district court left off.  The first court factor was

13  satisfied under the Farm Bill, if the court accepts the

14  *Serna* court's analysis.  Our case, again, is different.

15  There is rights-creating language.  There is a licensed

16  class of folks that the Farm Bill contemplates.

17       Farm Bill also contemplates bad state actors that try

18  to change laws.  And, again, in Arkansas, it changed the

19  definition of hemp that's not been done elsewhere.  There

20  is no other state that's dealt with this specific issue.

21  It changed the law in that way.

22       So I think the court could recognize the

23  rights-creating language as *Serna* did and it could

24  recognize that the plaintiffs are a protected class.  And

25  I think moving beyond that, I don't think there is any

1   offense to every notion of federalism and state

2   sovereignty that would conflict with a decision that

3   recognizes a private cause of action under 1983 or moving

4   beyond 1983 or maybe backwards toward the implication

5   doctrine.  I think the Court has that abundance authority,

6   but I also think the Court doesn't need to address that

7   issue if it doesn't want to because I think you have *Ex*

8   *parte Young* power here.

9       Personally, I'd like to see the area of 1983 law

10  developed because there's a dearth of case law on specific

11  issues when the remedy requested is narrowing here;

12  whether private actors are allowed to proceed.  I think

13  the bar and bench would be benefited by a decision that

14  says yes.

15      Thank you, Your Honor.

16      MS. BROYLES:  Just to round this out a little

17  bit, it goes back to the initial question, but also I just

18  don't want to make sure I'm covering this.  Again, these

19  cases are cited in the briefs, so I won't get too

20  technical.  I know we're pushing on time as well as a lot

21  of numbers and things that get confusing for our court

22  reporter as well.

23      But it is undisputed that the Farm Bill does not

24  create an expressed right -- private right of action.

25  They acknowledge that in their brief as well.  So the step

1    it has to go to whether there is an implied cause of

2    action.   And *Alexander V. Sandoval* is the -- the case at

3    which all the progenies follows as it relates to an

4    implied private right of action.

5         So in that case, the court -- the Supreme Court

6    outlines that you have to have the right-creating language

7    as well as the remedy language.   You have to have both

8    specifically.   And here we know we don't have the

9    right-creating language and -- that counsel keeps talking

10   about that the district court case having found this

11   protected class, and that was specifically addressed as

12   not true in the *Serna* case.

13        I want to cite the tenth court which said, plaintiff

14   asserts that 10 -- it's a 1011 part B, which is the

15   interstate commerce provision that would be the expressed

16   conflict provision at issue in this case -- creates a

17   private right for licensed farmers to be free from state

18   and tribal interference with the interstate transportation

19   of their industrial hemp, but Section 10114(b) makes no

20   mention of this purported class of licensed hemp farmers.

21   It does not say, for example, that licensed hemp farmers

22   may transport hemp interstate or that no person shall

23   prevent licensed hemp farmers from transporting hemp

24   interstate.   Instead, it says that no state or Indian

25   tribe shall prohibit the transportation or shipment of

1   hemp through their territory.

2        *Sandoval* makes clear that such language, which

3   focuses on the person regulated rather than the

4   individuals protected, does not imply an intent to confer

5   rights on a particular class of persons.

6        And it goes through and cites internal citations that

7   I'll skip for you.  Again, the court held that there was

8   no expressed or implied cause of action under the Farm

9   Bill, and that includes the preemption claims that are

10  issue in this case today.  So I wanted to make point of

11  that.

12       In *Does verse Gillespie*, which is an Eighth Circuit

13  case, the court specifically analyzes under *Sandoval* the

14  1983 analysis for cases where there is no private right of

15  action created.  And, again, the court there focuses on

16  the fact that you have to have rights-creating language as

17  well as the remedy.  1983 is a remedy.  It is not

18  rights-creating language.  So, again, you can't get away

19  from the fact that you have to have both of those in order

20  to create an implied right of action.

21       So I just want to clarify that for the Court just in

22  the -- hoping that it further buttresses the deal with

23  expressed conflict issue.

24            THE COURT:  Thank you.  I expect we better take

25  a break.  Before we do that, I want to talk to you a

little bit about Arkansas history.  As a matter of fact,
US history.

The woman back on the wall -- the portrait of the
woman, that's Elise Jane Trimbell Roy.  She was US
District Judge here until she was 93 years old.  She
presided over this courtroom.  The man back there was
Judge Tom Trimbell.  That was her daddy.

She -- as far as I know, she's the only daughter of a
federal district judge who became a federal district
judge.  Now, several men have -- their daddy was a federal
district judge become judges, but -- and at one time I
researched this, and she was the only one.  It's been
several years.

But at any rate, I had a case before her one time,
and Phil Dixon, great lawyer of yesteryear, was on the
other side.  And I had sued -- a little boy got hurt at a
power station, and I was arguing attracted nuance and he
was arguing against it.  And I told Judge Roy -- I said,
well, I have a district court here decided by Judge Tom
Trimbell, who was her daddy, that said it is attractive
nuance.  She said, let me see that case.  She looked at it
and said, I'm not going to rule against my daddy, so she
ruled in my favor.

She was a great, great person.

The picture over here, one of my former partners was

MORGAN - DIRECT

1   looking at it and said he thought that was Gene Autry.

2   But it's not.

3        We are in recess until 15 'til by that clock back

4   there.  Be at ease.  Be at ease.

5        (A recess was taken at 4:28 p.m. until 4:51 p.m.)

6             THE COURT:  All right.  I understand you're

7   going to call plaintiffs.

8             MR. MEHDIZADEGAN:  Yes, Your Honor.

9             THE COURT:  Tell me -- get them to tell me how

10  they've been hurt.  Don't take long.

11            MR. MEHDIZADEGAN:  I'm going to try to move

12  quickly.  Call Mr. Bill Morgan.

13       (The oath was administered.)

14          BILL MORGAN, PLAINTIFF WITNESS, DULY SWORN

15                    DIRECT EXAMINATION

16  BY MR. MEHDIZADEGAN:

17  Q.   Mr. Morgan, would you introduce yourself to Judge

18  Wilson?

19  A.   Your Honor, I'm Bill Morgan.  I'm a -- I'm a hemp

20  farmer up in Washington county near Fayetteville.

21  Q.   Are you the owner of Bio Gen?

22  A.   I am the owner.

23  Q.   There are any other owners?

24  A.   No.

25  Q.   What does Bio Gen do?

MORGAN - DIRECT

1    A.    Bio Gen does research on different varieties of hemp

2    to form the broadest or the widest of full-spectrum

3    products that I can put on the market.

4    Q.    What's full spectrum?

5    A.    As many different cannabinoids as -- that are known

6    to be beneficial that I can find genetically to use.

7    Q.    When you say "full spectrum," are you talking about

8    CBD?

9    A.    Yes.  I'm talking about CBD, THC, and all the minor

10   cannabinoids.

11   Q.    When did you get in this business?

12   A.    About four years ago.

13   Q.    Tell me about that.  What types of investments did

14   you make in -- in this process?

15   A.    Well, I was at a point in my life where I pretty much

16   retired.  I've been a builder and farmer my whole life.

17   When the Farm Bill was signed and then the State of

18   Arkansas picked it up, I'm like, man, I've got to grow

19   this plant.  And so I got on the program with the State

20   and did consulting the first year and organized all the

21   farmers in the area.  And then in 2020, I grew -- I

22   started growing on my own place.

23   Q.    What was your investment to get started in the hemp

24   market?

25   A.    Well, I put everything I had, basically, because I

MORGAN - DIRECT

1    figured I've got the federal government behind me, I got

2    the State now, we're an ag-related state, I'm going to go.

3    So I put together all my liquid assets and, kind of like

4    in the movies with the poker game, I just kind of went, I

5    can win at this.  I'm good.  I'm really good at what I do,

6    so here we go.

7           THE COURT:  You were a builder and farmer in

8    northwest Arkansas?

9           THE WITNESS:  Yeah.

10          THE COURT:  Raised up there?

11          THE WITNESS:  I was raised in southern

12   California.  I moved here in '79 back-to-the-land movement

13   when the hippies were looking for a good place to live,

14   just the values, the way the locals use plant medicine, it

15   just drew me here.  So, yeah, I've lived here for 45

16   years.

17   BY MR. MEHDIZADEGAN:

18   Q.   The State introduced some documents that say CBD is

19   evil and there's some type of effort to regulate it.  Did

20   you know on July 31 that CBD products would be made

21   illegal on August 1?

22   A.   No.

23   Q.   Had you seen Act 629 before this lawsuit was filed?

24   A.   No.

25   Q.   Had you known -- were you made aware at all that the

MORGAN - DIRECT

1  revision commission changed the law to make Sections 2

2  through 7 rather than 2 through 5?

3  A.    I didn't know that.

4  Q.    Did you -- let me ask the question differently.

5        Did you know that your products and your business

6  would be made illegal on August 1?

7  A.    No.  I had expressed that with the director who is in

8  this courtroom, and I expressed to him my concerns about

9  it, but he didn't know either because he said, no, don't

10 worry, everything is business as usual.

11 Q.    The director who's being sued here told you -- made a

12 statement to you that he didn't know?

13 A.    He didn't either.

14 Q.    The State didn't even know that Sections 6 and 7 that

15 changed the criminal code would actually become effective,

16 they didn't know?

17 A.    No.

18 Q.    That's the statement that the director -- who's the

19 director?

20 A.    Caleb Allen.

21 Q.    Can you point him out?

22 A.    Yeah, back row over in the last seat.

23 Q.    Not wearing a jacket, checkered shirt?

24 A.    Yeah.  He's the director of the State Department of

25 Agriculture Plant Industry Hemp Division.

MORGAN - DIRECT

1   Q.   Had no idea your product was going to be made

2   illegal.  He told you that today.

3   A.   Last time he was out to inspect my fields, I

4   expressed my concerns about this bill and he -- you know,

5   he said, everything was going to be fine.  So I didn't --

6   I didn't know until this happened.

7   Q.   Do you -- did you sell -- prior to August 1, did you

8   sell products in interstate commerce?

9   A.   Mm-hmm.

10   Q.   Did you -- do you have a number of employees who work

11   for you?

12   A.   I have none.

13   Q.   Who was your delivery driver?

14   A.   Me.

15   Q.   To even drive this products out of state now, that

16   exposes you to criminal punishment, right?

17   A.   Yes.

18   Q.   Did you know when you woke up on August 1 you would

19   be made a felon?

20   A.   No.

21   Q.   Did you expect that in your retirement you would be

22   engaged in what now Arkansas calls a felony?

23   A.   No.  Wouldn't touch it.

24   Q.   How much product did you have on July 31, the value?

25   A.   Quite a bit.  I've been growing the last few years

MORGAN - CROSS

1   when most of the people have not.  We started with, like,

2   125 licensed growers here.  And I don't know, we're down

3   to less than a dozen.

4   Q.   Over $100,000 worth of inventory?

5   A.   Yes.

6   Q.   And August 1, nothing, rendered useless, and you

7   can't even drive with it, right?

8   A.   No.

9        MR. MEHDIZADEGAN:   No further questions, Your

10  Honor.

11                 CROSS-EXAMINATION

12  BY MS. BROYLES:

13  Q.   Hi.  Good afternoon.  I'm also from northwest

14  Arkansas.  Well, you're from California, but nonetheless.

15       So you are a farmer, true?

16  A.   (Nods head).

17  Q.   So can you tell me -- this is a major

18  oversimplification.  But we have cows, so I don't have any

19  crops except my backyard, but I do have some cows.  That's

20  the extent of what I know about farming or any of the

21  related things.

22       But do you just grow hemp?  Is that all that you do

23  or --

24  A.   No.

25  Q.   What all do you do?

MORGAN - CROSS

1   A.   I also have a culinary mushroom business where I sell

2   to specific high-end restaurants.

3   Q.   With respect to hemp then, you just grow hemp?

4   A.   Correct.

5   Q.   You do not -- let me just cover this.  So this is --

6   I'm referencing Plaintiff's Exhibit 1, the Arkansas

7   Tobacco Control Information paperwork.  So it says Act

8   629, Senate Bill 358, what you need to know.  Products

9   that were produced by a synthetic chemical process that

10  converted hemp into delta-8, delta-9, delta-6A, TA,

11  delta-10 THC.

12       Do you grow any of those materials?

13  A.   Well, they're -- delta-8 is a minor cannabinoid in

14  what I produce.  When I get my lab analysis, it shows it.

15  Q.   Right.  This is a synthetic -- synthetic chemical

16  process.  So you don't do any synthesis of your product.

17  A.   No.

18  Q.   So what your -- your hemp plant as it was grown prior

19  to August 1, none of these things have been added to it --

20       MR. MEHDIZADEGAN:  Your Honor, I'm going to

21  object on the basis of rule of completeness and ask for a

22  complete reading because it says more and it says more

23  about psychoactive substances which are CBD.

24       THE COURT:  I'm aware of what it says.  Go

25  ahead.

MORGAN - CROSS

1   BY MS. BROYLES:

2   Q.   So then I just want to say, generally speaking then,

3   your product hasn't changed, correct?

4   A.   No.

5   Q.   If it were tested, it would still be under the .3 THC

6   requirement.

7   A.   When I harvest it, the State signs off on it and says

8   they've tested it and it's good to go.  I ship it

9   immediately.  I take it down here to Little Rock to a

10  licensed facility.  They extract the product and bottle it

11  for me and so it falls in the perfect guideline of .3.  I

12  don't have anything to do with that.  They're our

13  manufacturer.

14  Q.   When -- you have to fill out the hemp grower

15  application every year, correct?

16  A.   Correct.

17  Q.   As part of that application process, you sign off on

18  certain terms and conditions each year?

19  A.   Correct.

20        THE COURT:  Is there any question about the fact

21  that this law shuts him down?

22        MS. BROYLES:  In fact, I think he just showed

23  that nothing about this law shuts him down because his

24  product, again, is not synthetic whatsoever and, as he

25  said, it's under the .3 THC requirement.  So that's the

MORGAN - CROSS

1   point I'm getting at.

2          THE COURT:  Your position is he can keep on

3   operating?

4          MS. BROYLES:  Correct.

5          MR. MEHDIZADEGAN:  Your Honor, we move for

6   judgment as a matter of law as to void for vagueness.  The

7   Attorney General doesn't even know what the law says.  I

8   think we've made our case.  I assume -- certainly they're

9   both of ordinary intelligence or above that.  The law

10  absolutely regulates CBD.

11         THE COURT:  Denied.  Exception saved.

12         MR. MEHDIZADEGAN:  Thank you, Your Honor.

13  BY MS. BROYLES:

14  Q.   As part of the acknowledgement that you signed, one

15  of them is that you acknowledge that the USDA and Arkansas

16  State Police, the Federal DEA, and other law enforcement

17  agencies are allowed to come onto your property and

18  request information from you.

19  A.   Sure.

20  Q.   It also states that you accept an inherent risk

21  associated with participation in the program because hemp

22  is a new agricultural crop.

23  A.   Correct.

24  Q.   And both personal and financial loss may be possible.

25  And you agree that the department is not responsible for

MORGAN - CROSS

1    reimbursing or compensating any program participants for

2    any loss resulting from involvement with the program, for

3    any acts by the department or its agencies or

4    administration of the program.

5    A.    Correct.

6    Q.    You have to reapply on an annual basis.  We covered

7    that.

8          You also acknowledge that -- I recognize that hemp is

9    a restricted crop.  As such, it is illegal to grow or

10   possess raw industrial hemp materials in Arkansas outside

11   the auspices of the Department Hemp Program.  And so,

12   again, recognizing that it is a regulated product.

13   A.    It is.

14             MS. BROYLES:  No further questions.

15             MR. MEHDIZADEGAN:  Nothing further.

16             THE COURT:  You may stand down.  Thank you.

17             MR. MEHDIZADEGAN:  Your Honor, we'd call Scout

18   Stubbs.

19        (The oath was administered.)

20          SCOUT STUBBS, PLAINTIFF WITNESS, DULY SWORN

21                    DIRECT EXAMINATION

22   BY MR. MEHDIZADEGAN:

23   Q.    Good afternoon, Scout.

24   A.    Hello.

25   Q.    Would you please introduce yourself to Judge Wilson?

STUBBS - DIRECT

1   A.   My name is Scout Stubbs, and I own Drippers Vape and

2   Hemp.   We have four stores in the state of Arkansas where

3   we manufacture vapor and hemp products.

4   Q.   You said "manufacture."   Did you mean that in the

5   past tense?

6   A.   Manufactured, correct.

7   Q.   How long have you been doing this?

8   A.   We started our stores just with vaping to help people

9   quit smoking back in 2014, and we got into the hemp

10   business back in 2019.

11   Q.   When you say "vaping," I just want to make sure I

12   understand.   We're talking about alternative -- products

13   alternative to cigarettes.

14   A.   Yes, yes.   People that want to quit nicotine.

15   Q.   Things you can still buy today?

16   A.   Correct.

17        THE COURT:   Where are your headquarters?

18        THE WITNESS:   Greenbrier, Arkansas.

19   BY MR. MEHDIZADEGAN:

20   Q.   I know you have to leave here -- I think leave there

21   after home school -- from home school to come here today.

22   A.   Yes.   I have two little girls.

23   Q.   Tell me why you got into this business of hemp.

24        THE COURT:   You a native in Greenbrier?

25        THE WITNESS:   Do what?

STUBBS - DIRECT

1      THE COURT:  Are you a native of Greenbrier?

2      THE WITNESS:  No.  I'm from Batesville, but my

3  grandmother was from Greenbrier, so I moved there when she

4  was in her 80s to be closer to her.

5  BY MR. MEHDIZADEGAN:

6  Q.  Why did you get into the hemp business?

7  A.   It seemed like a natural thing to segue into when the

8  federal government came out and supported us with the Farm

9  Bill and then the State of Arkansas came right behind that

10  and said, this is a new agricultural product and we

11  recognize it as legal.  It seemed like a natural thing for

12  us to get into because we already helped our customers

13  with healthier by quitting cigarettes that I wanted to

14  help people quit pharmaceuticals.

15      My dog was epileptic.  And so we tried CBD after he

16  was on some really heavy medication from the vet.  Long

17  story short, we switched him from the pharmaceuticals to

18  CBD exclusively.  That's what made me see the real power

19  of this.

20      THE COURT:  What kind of dog?

21      THE WITNESS:  He's a Shiba Inu.  It's weird.

22  It's kind of like a miniature Akita, but he's 15 now.

23  BY MR. MEHDIZADEGAN:

24  Q.  Do you let your children, your two girls, use CBD?

25  A.   Yes, I do.  The lotions that we make and then also

STUBBS - DIRECT

1  the gummies.

2  Q.   What made you get into manufacturing?  Tell me about

3  that.

4  A.   That's another thing that -- I like to know what's in

5  my products that I'm using, and that's always been kind of

6  our thing, is that I'm using what you're using.  And I

7  don't want anything foreign or strange from the moon where

8  people don't know what it is.  I know what's in it because

9  I make it.  So I know it's going to test out right.  I

10 know it's not going to be unsafe.  I know it's not from

11 China.  It's from here.

12 Q.   How do you know that?  Tell me where do you get your

13 product -- your hemp -- is it hemp distillate?

14 A.   Distillate is what I get and raw hemp material from

15 Oregon, Colorado, and then distillates from Stuttgart.

16 There's a farm in Stuttgart that I get some from.

17 Q.   Do you sell across state lines, or did you?

18 A.   No.

19 Q.   Was that part of your business where you were trying

20 to expand to?

21 A.   No.  We're Arkansas.

22 Q.   Have you had out-of-state folks not want to come in

23 and do business with you anymore because of these new

24 laws?

25 A.   Oh, yeah.  Oh, yeah.

STUBBS - DIRECT

1   Q.   Did you have an inventory of hemp products on July

2   31?

3   A.   I did.

4   Q.   Did you know that on August 1 those products would

5   not just be regulated, but now made illegal and subject

6   you to criminal penalty?

7   A.   No.

8   Q.   The State appears to be confused about what the law

9   does.  And you have the most interesting entanglement with

10  the State as far as this goes.

11       Will you tell the Judge, have you been visited by

12  regulators?

13  A.   Yes.  I have a store in Hot Springs.  And the manager

14  of that store called me and said that the ATC had come in

15  and told him to take down a full-spectrum, which is a CBD

16  product, off the shelf.  I clearly label all my products

17  if they want delta-9 in them.  And that's just so people

18  don't -- don't want to take that, don't have to take that

19  or if they have to pass a drug test or for whatever

20  reason, I clearly label that.  So I'm guessing the

21  regulator saw delta-9, told me to take it off the shelf.

22  So we complied.

23  Q.   So when you say delta-9, more than .3 percent?

24  A.   Absolutely not.  This was a legal CBD product.

25  Q.   You could not sell anything with delta-9 more than .3

STUBBS - DIRECT

1  percent before --

2  A.    We already couldn't do that.  We never did that

3  anyway.

4  Q.    That's what cultivators and dispensaries do, correct?

5  A.    Correct.

6  Q.    You're not selling that though.

7  A.    No.

8  Q.    You can't.

9  A.    Right.

10  Q.    But you can for federal law sell hemp-direct products

11  that contain .3 or less?

12  A.    Yes.

13  Q.    The State regulator, the folks who were supposed to

14  enforce this law, came in and told you to remove CBD from

15  the shelf.

16  A.    Yes.

17  Q.    That's what they did.

18  A.    My manager was not trying to be confrontational or

19  anything.  And I'm not either, but it bothers me that this

20  is a legal product and even the regulator that was coming

21  in didn't understand what the product was, and who am I

22  supposed to go to to resolve this.

23  Q.    Trying to understand this.  Hemp-direct product with

24  .3 or less delta-9 THC.

25  A.    Yes.

STUBBS - DIRECT

1  Q.    The State just said that that's perfectly legal.

2  They made you take that down.

3  A.    Yes.

4  Q.    How much inventory -- what's the value of your

5  inventory of these products?

6  A.    Probably about 50,000, but I want to put my employees

7  in that list too because I had to hire additional

8  employees to help with our manufacturing side of things.

9  Q.    And now?

10 A.    I mean, they're working the retail side, but I'm

11 going to have to let them go pretty soon.

12 Q.    How much overall investment did you make in your

13 business?

14 A.    Probably about $100,000, give or take.  And that's

15 over a few years.

16 Q.    Then overnight, $50,000 in inventory alone --

17 A.    Yes.

18 Q.    -- rendered worthless.

19 A.    Yes.

20 Q.    You don't have an ability to send this out of state.

21 A.    No.  I can't possess it.

22 Q.    Kind of in a quagmire now, aren't you?

23        Is there a way for you to be able to distinguish how

24 much delta-9 is in CBD?

25 A.    No.

STUBBS - DIRECT

1   Q.   Because that doesn't make sense, right?

2   A.   No.

3            MR. MEHDIZADEGAN:   Thank you, Your Honor.

4            THE COURT:   You know Billy Don Hogg down below

5   Greenbrier, the saddle maker?

6            THE WITNESS:   Yeah.   He was friends with my

7   Mamaw May, the one that -- she passed away.   She lived in

8   Greenbrier right there on Elliott Road.   She was his

9   neighbor.   My grandfather was Biddle May who was really

10  good friends with him.

11           THE COURT:   You know Kenny Wilcox, the world

12  champion bull rider?

13           THE WITNESS:   Yeah.   The land that we live on

14  used to be a potato farm, and Kenny used to own it, our

15  six acres that we have.

16           THE COURT:   They're both good friends of mine.

17           THE WITNESS:   I know all of those people.

18           THE COURT:   I guess that don't have much to do

19  with this lawsuit.

20           MR. MEHDIZADEGAN:   I think it has everything to

21  do with this lawsuit, Your Honor.   I think we're here to

22  protect farmers and merchants who try to sell these

23  products.   So I think it has everything to do with it.

24  Thank you.

25                    CROSS-EXAMINATION

STUBBS - CROSS

1    BY MS. BROYLES:

2    Q.    Did you know Junior and Jane Tapley?

3    A.    No.

4    Q.    They're about right across the street from you on

5    Oak, you're Dripper spot in Greenbrier.  That's my family

6    there.  Since we're all family here, I thought I'd mention

7    it.

8         Okay.  So I got your declaration here.  You said in

9    your testimony that you don't sell your products outside

10   of Arkansas.

11   A.    No.

12   Q.    And you -- do you sell any intoxicating products?

13   A.    I don't really like that word to describe things

14   because, I mean, like we've kind of pointed out before,

15   that psychoactive can mean a lot of things, like sugar or

16   chocolate.  But CBD is psychoactive itself, so yes.

17   Q.    Would you agree that there are industry leaders who

18   disagree that CBD has the same psychoactive effects -- who

19   would say that the psychoactive effects that are

20   associated with THC are not present in CBD?

21   A.    According to the State definition, no.

22   Q.    I'm sorry?

23   A.    Well, according to the State, anything psychoactive

24   in the plant is now not able to sell, so I'm including CBD

25   in that because they came in and they told me to remove

STUBBS - CROSS

1    that product from my shelf.

2    Q.    Right.  We'll get to that in a second.

3         But in your studies of hemp, hemp products, things of

4    that sort, medicinal purpose, you would agree that

5    generally speaking CBD does not have the high causing

6    effect that psychoactive substances have, true?

7    A.    True.

8    Q.    You said you have four -- four stores in Arkansas.

9    A.    Yes, ma'am.

10   Q.    Nothing out of state again.

11   A.    No.

12   Q.    Do you have any knowledge of whether or -- any kind

13   of testing that you do to show whether the final product

14   that you sell on your shelves has more than .3 THC?

15   A.    Yes.

16   Q.    Do any of your products that show final testing have

17   greater than .3 THC?

18   A.    No.

19   Q.    So regardless, you're under the .3 THC.

20   A.    That's correct.

21   Q.    Your hemp distillate, can you tell me what that is?

22   A.    I'm not a scientist, but, basically, it's an extract

23   from the hemp plant.

24   Q.    Do you have the paperwork whenever you attain that

25   from the grower, whomever, that shows that it passes the

STUBBS - CROSS

1    .3 THC content?

2    A.    .3 percent delta-9, yes.  Yes.

3    Q.    I assume that would be true too for the raw hemp as

4    well.

5    A.    Yes.

6    Q.    You said something like people do not want to come

7    buy from you that are out of state.

8    A.    I believe that was something that Abtin alluded to,

9    is that out-of-state have trouble dealing with Arkansas

10   businesses because they're afraid now that this new law

11   passed.  It's confusing and they don't know how to

12   interpret it.

13   Q.    That's not your words; that's what he's saying.

14   A.    Something along those lines maybe is what he said.

15   Q.    So you haven't had any other businesses, individuals,

16   who said, hi, I'd like to take your business across state

17   lines and now they're unwilling to do that?

18   A.    No, nothing like that.

19   Q.    You've had no one, say, from Texas come in and say,

20   I'm not going to buy from you or something to that degree?

21   A.    No.  It's more of like the distributors and

22   manufacturers that I do business with that I would be

23   buying from.

24   Q.    Okay.  You haven't gotten any kind of citation or

25   anything from the tobacco control.

STUBBS - CROSS

1   A.    No.

2   Q.    Did you obtain any report or any documentation of

3   that stop in?

4   A.    No.   It was a courtesy visit that was just making

5   sure that retailers were following the rules is what he

6   said.

7   Q.    Are your products to your knowledge -- you said you

8   make them yourself.

9   A.    For the most part.

10  Q.    So what are you selling?

11  A.    What we did sell were lotions, tinctures, cartridges,

12  gummies.  I think that's about it.

13  Q.    Do you make cartridges?

14  A.    Yes.

15  Q.    Do you use any synthetic process between obtaining

16  the raw hemp product to making into a vape cartridge?

17  A.    Not that --

18          MR. MEHDIZADEGAN:  Your Honor, I'm sorry to

19  interrupt the testimony if you want us to move along.  I

20  will object to the extent that she's asking my lay witness

21  for an expert or scientific definition of synthetic.

22  Mr. Krause testified about that.  She's not qualified to

23  do so.

24          THE COURT:  Overrule.  Exception saved.

25          MR. MEHDIZADEGAN:  Thank you, Your Honor.

STUBBS - CROSS

1   BY MS. BROYLES:

2   Q.   You make it yourself, right?

3   A.   We do.

4   Q.   So do you -- do you use any synthesis to convert your

5   product from what would be the .3 THC level to a higher

6   amount?

7   A.   No, but the State has never defined what a synthetic

8   process is, so I worry that what if my raw material does

9   not meet that definition.

10  Q.   You are worried that raw material might meet a

11  synthetic definition?

12  A.   I'm not sure because it's never been defined in the

13  law.

14        MS. BROYLES:   No further questions.

15        MR. MEHDIZADEGAN:   No further questions, Your

16  Honor.

17        THE COURT:   You may stand down.   Thank you.

18        MS. SCOTT:   Plaintiffs would like to call Mary

19  Szarmach.

20      (The oath was administered.)

21        MARY SZARMACH, PLAINTIFF WITNESS, DULY SWORN

22                    DIRECT EXAMINATION

23  BY MS. SCOTT:

24  Q.   Would you please state your name for the record?

25  A.   Yes.   My name is Mary Szarmach.

SZARMACH - DIRECT

1    Q.    And what do you do for a living?

2    A.    I'm the senior vice president of government and

3    external affairs for Smoker Friendly, the cigarette store.

4    We do business here in Arkansas.  We do business in 13

5    states.  We're a family business owned by my three

6    brothers and myself out of Boulder, Colorado.

7    Q.    What type of products does Smoker Friendly sell?

8    A.    We sell tobacco, nicotine products, hemp products,

9    tobacco and nicotine and hemp accessories, those kinds of

10   products.  Liquor in some stores.

11   Q.    What type of investments has Smoker Friendly made in

12   the hemp market in Arkansas?

13   A.    We made an acquisition about a year -- just a little

14   over a year ago of the Tobacco Super Stores here in

15   Arkansas, also Mississippi, Tennessee, and Kentucky.  Some

16   of those stores fell in, but the brunt of them were in

17   Arkansas.  They were based out of Forrest City.

18         And so they were selling the products already because

19   they were legal products.  We don't do any manufacturing

20   or anything of that sort, but we sell the products.  And

21   we grew that business in the last year.  And, you know, we

22   did do some investment in it to get nicer cases and clean

23   up the product and make sure it was reputable product.

24   And so we had a lot of money in our inventories, probably

25   about 400, $450,000, I'd say.

SZARMACH - DIRECT

1   Q.   How much in sales did you make last year on hemp

2   products in Arkansas?

3   A.   In our 58 stores in Arkansas, it was over $2 million.

4   Q.   And on July 31, how much inventory of hemp products

5   did you have in Arkansas?

6   A.   We had around 300, $350,000 on our shelves in the 58

7   stores.

8   Q.   Did you know that your hemp products in Arkansas as

9   of August 1 would not just be subjected to regulation by

10  this act, but would also be made illegal and subject you

11  and potentially your employees to criminal sanctions?

12  A.   We knew that -- the regulatory side, but we did not

13  know about the criminal sanctions and that that -- we were

14  putting our employees in that space.

15  Q.   What harm has Smoker Friendly suffered because of the

16  act?

17  A.   The major harm is obviously the loss of sales of an

18  entire product category within our stores and the profits

19  that provide all kind of things for our employees here.

20  So it's a loss.   A big loss of profits.

21  Q.   And that inventory that you had in Arkansas as of

22  today, is it utterly worthless?

23  A.   Yes.

24          MS. SCOTT:   No further questions.

25                      CROSS-EXAMINATION

SZARMACH - CROSS

1    BY MS. BROYLES:

2    Q.    Good afternoon.

3    A.    Good afternoon.

4    Q.    Can you say your last name for me one more time?

5    A.    Szarmach.

6    Q.    Szarmach.   Okay.

7          You said you're from Boulder, Colorado?

8    A.    Yes.   We're based in Boulder, Colorado.

9    Q.    And Colorado currently also has regulations on

10   delta-9, delta-10?

11   A.    They do since they allowed recreational marijuana.

12   Q.    So I think you just testified that you did not know

13   until August 1 of 2003 [sic] that certain products would

14   not be illegal in Arkansas?

15   A.    No.   I knew that there would be products that were

16   going to be illegal.   I didn't realize that there would be

17   some criminal sanctions for people that had any inventory

18   in their stores, that we could have possibly put our

19   people in harm's way of being a felon.

20   Q.    This complaint was filed on July 31, 2023, true?

21   A.    Yes.

22   Q.    And you signed your affidavit in support of your

23   motion for temporary restraining order, according to your

24   affidavit, on -- well, excuse me.   This isn't an

25   affidavit.   This is just a declaration.   But it's dated

1   July 31 of 2023.

2       Does that sound right to you?  I can show it to you.

3   A.   Yeah.

4   Q.   That's Document 2-7.

5       Do you sell liquor with THC?

6   A.   No, we do not.

7   Q.   Just checking.  You said you had both.

8       Do you do any testing of the final product?

9   A.   No, we do not.  We rely on our manufacturers and

10  distributors to handle that and get just the paperwork and

11  records on the products that we decide to sell.

12  Q.   You have no knowledge as to whether any of your

13  products have a higher THC content than the .3 percent

14  that's allowed even under federal law.

15  A.   We actually get reports from our distributors that

16  prove that they do not have a higher amount of THC than

17  the .03.

18  Q.   So you actually have lab testing showing that your

19  products still stay under the .3 percent even in final

20  form.  Is that what you're saying?

21  A.   That's what I'm saying, provided by our manufacturers

22  and distributors.  We don't do the lab testing.

23  Q.   You're aware of the oath, the -- I mean, the

24  countrywide concern with respect to the sale of

25  consumables in this market as it relates to the final

SZARMACH - CROSS

1  product having much higher concentrations of THC than .3

2  percent?

3  A.   I mean, I've heard of that, but we didn't participate

4  in any of those products.

5  Q.   So you don't sell any of those?

6  A.   Uh-uh.

7  Q.   Y'all don't sell the ice cream that -- it looks like

8  an M & M ice cream sandwich, but it's got --

9  A.   No, we do not.  We don't -- we really limit to

10 adult-oriented products, legal products in our stores.

11 So, you know, we went through that where they tried to

12 sell that and vaping and different other adult consumable

13 products that are age restricted.  And so we've always

14 stayed away from that.  We just sell to adults only and we

15 don't sell any of the cartoony type products, if you will,

16 in any of the categories.

17 Q.   Do you -- I'm sure you understand, as a retailer in

18 multiple states, that that is a concern that states all

19 over the country are currently trying to regulate.

20 A.   Absolutely.

21 Q.   And I guess, based on your testimony, I recognize,

22 again, that quote/unquote intoxicating, that term may be

23 somewhat confusing to some.  But since you only sell to

24 21-year-olds, would you agree that the products that you

25 sell don't cause the high effect of the usual psychoactive

SZARMACH - REDIRECT

1  substances?

2  A.   I'm not a scientist, so I'd rather not comment on

3  that to be honest with you.

4  Q.   Fair enough.

5        MS. BROYLES:   No further questions.   Thank you.

6                    REDIRECT EXAMINATION

7  BY MS. SCOTT:

8  Q.   Very briefly, Your Honor.

9        So did you read Sections 2 through 5 of the law?

10  A.   Yes, I did.

11  Q.   And you understood -- your understanding before this

12  lawsuit was filed that those provisions of the law were

13  the ones that were going to become effective on August 1?

14  A.   That's correct.

15        MS. SCOTT:   No further questions.

16        THE COURT:   You may stand down.   Thank you.

17        MR. MEHDIZADEGAN:   Your Honor, we have no

18  further witnesses.   I'm not sure if the Court would like

19  argument on the TRO.   We certainly stand on our briefing.

20  We have about five minutes of summation or argument.

21        THE COURT:   Do you have witnesses?

22        MS. BROYLES:   No, Your Honor.

23        THE COURT:   You're not going to let your

24  colleague there do anything?

25        MS. CRYER:   I was planning to repeat everything

1    that Ms. Broyles has said.

2           THE COURT:  How is your brother John doing?

3           MS. CRYER:  He's doing wonderful, Your Honor.

4           THE COURT:  Give him my regards.

5           MS. CRYER:  I will.  Thank you.

6           THE COURT:  I've known Ms. Cryer since she was

7    preschooler.  She and her -- they live nearly across the

8    street from us when she and her brother were young and my

9    children were young.

10       Let me consult with my lawyer.

11       You want to file an affidavit by an expert.  Is that

12   correct?

13          MS. BROYLES:  Yes, Your Honor.  I'd like the

14   opportunity -- I would like the opportunity to provide

15   some response to the expert since we -- I didn't realize

16   that an expert would be coming today.  I know there are

17   clarifications that are warranted.  No disrespect.  I just

18   -- I wasn't prepared to cross-examine on every aspect of

19   the science and what have you today.  So to avoid any kind

20   of re-required direct examination, cross, if the Court is

21   okay with it, I think an affidavit would suffice.  Now

22   that said, I may need a couple of days to do that.

23          THE COURT:  How much time do you want?

24          MS. BROYLES:  I could probably do it by Friday.

25          THE COURT:  Today is Wednesday.

1          MS. BROYLES:  What's today?  Wednesday.  I've

2    got a hearing and depositions all day tomorrow, so I

3    should probably need until next Tuesday or Wednesday.

4          THE COURT:  Any objection?

5          MR. MEHDIZADEGAN:  Your Honor, no objection, but

6    if I may be so bold to offer a suggestion that would I

7    think help both sides; is to enjoin this law on a

8    temporary basis to allow these folks to get rid of their

9    product so that they can do so in a lawful manner and

10   allow this case to be litigated in a forthright manner

11   while the status quo is maintained so we can not only

12   provide an affidavit from an expert.  I'll need to depose

13   that person.  Obviously, need to provide an expert report.

14   My proposal, Your Honor, is to grant the temporary

15   restraining order while the lawyers work to develop a case

16   and to present you with the information you need to

17   determine whether or not we succeeded at the final trial

18   on merits.

19         MS. BROYLES:  Just general response, based on

20   our argument before the Court, I don't technically think

21   -- again, it's not for me to decide, but I think the law

22   and arguments that we've articulated today show that the

23   Court lacks jurisdiction under the private right of action

24   cases that we've cited.  Therefore, any injunction,

25   whether temporary, preliminary, all the things would be

1  without the Court's jurisdiction.  So I think that issue

2  has to be addressed before we get to hurdles because that

3  -- that existing means they haven't met their burden or

4  success on the merits for PI purpose.

5       So in any event, that's where we are.  We may -- if

6  the Court is inclined to grant that motion, then -- or

7  reach that finding, an expert may not be needed at this

8  point either.  So there's a couple of things pending.

9            THE COURT:  Were you raised in Fayetteville?

10           MS. BROYLES:  I was.

11           THE COURT:  Where did you pick up either and

12  neither?

13           MS. BROYLES:  I don't know.  Honestly, I spent

14  some years in Greers Ferry with my grandma, so that's one

15  thing.  I know I went to Mizzou for undergrad, and they

16  always laughed at fixin' to.  And I love fixin' to.

17  That's just fixin', fixin' to, those are efficient words,

18  but that's one of my favorites is either, neither.

19           THE COURT:  Mr. M was about to swell up and bust

20  if he didn't get to say something.

21           MR. MEHDIZADEGAN:  I wanted to tell you some --

22  so being from Maine, one of my favorite words is "y'all."

23  I think y'all is important here because y'all is not just

24  the Governor and not just the Attorney General.  We sued a

25  number of other entities for whom the Attorney General has

1  answered, not moving to dismiss.  So the arguments are

2  narrow as to the Governor and as to the Attorney General.

3  The prosecuting attorneys who are represented and the

4  other agencies from whom they have not sought a dismissal

5  are alive.  So I don't think that that argument addresses

6  the full scope of where we are today.

7        MS. BROYLES:  The private right of action is

8  jurisdiction as to all defendants.  So it does apply to

9  everyone.

10        THE COURT:  I tell you what.  You want until

11  when to file your affidavit?

12        MS. BROYLES:  I got -- we're at end of today

13  Wednesday.  I'm in hearing -- I got a hearing with --

14        THE COURT:  Noon Wednesday, next Wednesday okay?

15        MS. BROYLES:  Can I get Thursday?  Thursday by

16  noon?

17        THE COURT:  What if I'd said Tuesday, you would

18  want Wednesday?

19        MS. BROYLES:  Well, I'm just throwing it out.  I

20  might say Friday and then we can decide.

21        THE COURT:  Thursday at noon.

22        MS. BROYLES:  Thursday noon?

23        THE COURT:  Yeah.

24        MS. BROYLES:  You got it.

25        THE COURT:  Anything else before we recess?

1          MR. MEHDIZADEGAN:  Your Honor, we renew our

2     request for a temporary restraining order, at least in the

3     interim until Thursday at noon.

4          THE COURT:  All right.  I'll take your request

5     under advisement as judges say.

6          All right.  We are in recess.  You can be at ease.

7     Be at ease.  Good to have you.

8          (Proceedings adjourned at 5:35 p.m.)

9                        *  *  *  *  *

10              REPORTER'S CERTIFICATE

11       I, Valarie D. Flora, FCRR, RPR, certify that the

12     foregoing is a correct transcript of proceedings in the

13     above-entitled matter.

14       Dated this the 15th day of September, 2023.

15     /s/ Valarie D. Flora, FCRR

16     --------------------------

17     United States Court Reporter

18

19

20

21

22

23

24

25